CRESCENT/MACH I PARTNERS, L.P., Plaintiffs,

v.

Jim L. TURNER, et al., Defendants.

No. 17455.

Court of Chancery of Delaware, New Castle County.

Submitted: March 23, 2000.
Decided: Sept. 29, 2000.

Grover C. Brown and Joseph C. Schoell of Morris, James, Hitchens & Williams, LLP, Wilmington, Delaware. of Counsel: Patrick Lynch, Patrick Downes and Marc S. Williams of O'Melveny & Myers, LLP, Los Angeles, CA, for Plaintiffs.

John H. Small and Ronald A. Brown, Jr. of Prickett, Jones & Elliott, Wilmington, DE; David A. Bryson and Nicholas A. Foley of Neligan & Averch, LLP, Dallas, TX., of counsel, for Defendants Jim and Julie Turner Family Partnership, Ltd., JLT Beverages, L.P., Jim L. Turner, William O. Hunt and J. Kent Sweezey.

Jon E. Abramczyk and David J. Teklits of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendants Cadbury Schweppes, P.L.C., CSI, B.V., American Bottling Holdings, Inc., Dr. Pepper/Seven–Up Bottling Group, Inc., Tosca Acquisition Corp., The Carlyle Group L.P., Carlyle Bottling L.L.C., Carlyle Holding Corp., and Dr. Pepper Bottling Holdings, Inc.

## OPINION

STEELE, V.C. (by designation).

## I. INTRODUCTION

Plaintiffs bring this action alleging that the directors of Dr. Pepper Bottling Holdings, Inc. ("Holdings") breached their fiduciary duties of loyalty, care and "good faith" in approving the merger of Tosca Acquisition Corporation, a wholly owned subsidiary of Dr. Pepper/Seven–Up Bottling Group, Inc., with and into Holdings, the surviving corporation. According to plaintiffs, the Turner Family Partnership, Ltd., Cadbury Schweppes, P.L.C., Cadbury Schweppes Investments, B.V. ("CSI"), Carlyle Bottling, L.L.C., The Car-

lyle Group ("Carlyle"), Carlyle Holding Corporation, ABC Bottling Holdings, Inc., Bottling Group and Tosca aided and abetted the directors' breaches of fiduciary duty. Plaintiffs also name JLT Beverages, L.P., a Texas limited partnership and an affiliate of Turner, as a defendant arguing that JLT played an integral role in the merger.

Certain defendants move to dismiss plaintiffs' Complaint for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2) and for failure to state a claim against the director defendants for which relief could be granted under Rule 12(b)(6). Certain defendants also move to dismiss the action under Rule 12(b)(6) for failure to state a viable aiding and abetting claim.

For the reasons articulated below, I dismiss several of the plaintiffs' claims. Others remain. Notably, I find that this Court lacks personal jurisdiction over defendant Carlyle Holding Corp. I also find that plaintiffs fail to state a claim against Bottling Group, CSI, Carlyle Bottling, ABC and Tosca for aiding and abetting the directors' alleged breaches of fiduciary duty.

## II. BACKGROUND

### A. The Parties

#### 1. The Plaintiffs

Crescent/Mach I Partners, L.P., is a Delaware limited partnership and beneficial owner of 50,000 shares of Holdings. Delaware Charter Guaranty Trust is a beneficial owner of 50,000 shares of Holdings.[1]

---

1. The trust is for the benefit of the remaining plaintiffs: Richard Handler, HCM High Yield Opportunity Fund, L.P., Jefferies & Company, Inc., Leveraged Equity Opportunity Fund, L.P., David William Schwartz, Shared Opportunity Fund IIB, L.L.C., TCW/Crescent Mez-

zanine Investment Partners, L.P., TCW/Crescent Mezzanine Partners, L.P., TCW/Crescent Mezzanine Trust, TCW Leveraged Income Trust, L.P., TCW Leveraged Income Trust II, L.P., TCW Shared Opportunity Fund II, L.P., Wayland Investment Fund, L.L.C.

At all relevant times, plaintiffs have been minority stockholders of Holdings.

## 2. The Director Defendants & Affiliates

Since its formation in 1988, Jim L. Turner ("Turner") has served as Holdings' Chairman of the Board and Chief Executive Officer. At all relevant times, Turner controlled JLT Beverages and the Turner Family Partnership. The Turner Family Partnership, a Texas partnership whose principal place of business is Texas, is a stockholder of Holdings. Turner and the Turner Family Partnership affiliate hold 61.5% of Holdings' issued and outstanding shares of common stock. JLT Beverages, a Texas limited partnership, owns the brand name and franchise rights to Snapple brand products and Deja Blue brand products.

The remaining members of Holdings' board of directors are William O. Hunt and J. Kent Sweezey (collectively with Turner the "director defendants"). Sweezey is also a managing director of Donaldson Lufkin & Jenrette Securities Corporation ("DLJ"), the investment-banking firm retained by Holdings.

## 3. Holdings & The Unaffiliated Defendants

Holdings is a Delaware corporation whose principal place of business is Texas. Holdings is an independent bottler of various beverage brand products including Dr. Pepper and Seven–Up which are owned and franchised by Cadbury Schweppes, P.L.C.[2] It is the largest independent franchise bottler of Dr. Pepper brand products and the second largest franchise bottler of Seven–Up brand products.

Cadbury Schweppes is a United Kingdom corporation whose principal place of business is London, England with operations worldwide. Cadbury Schweppes owns the Dr. Pepper and Seven–Up brand beverages and franchises the right to bottle the soft drinks to Holdings and ABC. Cadbury Schweppes uses CSI, a Dutch corporation whose principal place of business is London, England, as a finance subsidiary in connection with the development and use of the Dr. Pepper and Seven–Up brands. CSI owns 40% of the outstanding voting stock of ABC.

Bottling Group, formerly known as Tosca Holdings, Inc., a subsidiary of Cadbury Schweppes, is a Delaware corporation whose principal place of business is London, England. Under the merger agreement, Tosca, a Delaware corporation and wholly owned subsidiary of Bottling Group, merged with and into Holdings. The merger would eventually permit Cadbury Schweppes and Carlyle to pursue a combination of ABC and Holdings under the ownership of Bottling Group.

ABC is a Delaware corporation whose principal place of business is Darien, Illinois. ABC, which owns the American Bottling Company, is the leading competitor of Holdings. It is the second largest independent bottler of Dr. Pepper brand products and the largest franchise bottler of Seven–Up soft drinks and the leading competitor of Holdings. ABC is owned by CSI, an affiliate of Cadbury Schweppes, and Carlyle Bottling, an affiliate of Carlyle.

Carlyle is a Delaware limited partnership whose principal place of business is Washington, D.C. In a joint venture with Cadbury Schweppes, Carlyle initiated the business combination between ABC and Holdings which led to the Tosca—Holdings merger proposal. Carlyle's operating

---

**2.** Holdings also produces, markets and distributes A & W, Sunkist, Welch's, Canada Dry, Schweppes, Hawaiian Punch, Sunny De- light, Big Red, RC, Mistic, Snapple, Arizona, Evian, Perrier and Deja Blue.

companies are owned by the Carlyle Holding Corporation, a subsidiary of Carlyle whose principal place of business is Washington, D.C. Carlyle Holding owns Carlyle Bottling, a Delaware limited liability company whose principal place of business is Washington, D.C.[3]

## B. Factual Background

### 1. Negotiations Begin to Structure a Plan of Merger

In 1998, representatives from Cadbury Schweppes and Carlyle approached Turner about a potential business combination between Holdings and ABC. This proposal would combine two of the largest independent and franchised soft-drink bottlers of Dr. Pepper and Seven–Up brand products in the United States. In connection with the Holdings and ABC combination, Tosca would merge with and into Holdings, the surviving entity. As a result of this proposal, both ABC and Holdings would become wholly owned subsidiaries of Bottling Group.

### 2. The Merger Plan

The plan of merger proposed to convert certain shares of Holdings' Class A Common Stock not owned or controlled by Turner into the right to receive $25 per share, the cash-out price. Thus, the equity interest of all pre-merger stockholders in Holdings would be terminated.

Assuming all pleaded facts to be true, the plan of merger was structured, as plaintiffs suggest, to maximize Turner's personal benefit at the expense of the other stockholders. This would be accomplished through various "side-deals" that Turner initiated for himself and his affiliates. The many "side-deals" that the Complaint objects to include: (i) the Turner Family Partnership contracting with Bottling Group to contribute one million shares of Holdings' stock, owned and controlled by Turner, to Bottling Group in exchange for 250,000 shares of Bottling Group thereby securing for Turner a substantial equity interest in the surviving entity (the "Turner Contribution Agreement"); (ii) CSI and Carlyle Bottling contracting for a stock exchange with Bottling Group in which they agreed to exchange their stock in ABC for stock in Bottling Group (the "ABC Contribution Agreement"); (iii) Holdings redeeming approximately 6 million shares of its stock owned or controlled by Turner or the Turner Family Partnership for $25 per share thereby securing for Turner certain tax advantages not offered to other stockholders (the "Redemption Agreement"); (iv) making the merger contingent on the sale of JLT Beverages' claimed brand name Deja Blue and franchise rights in Snapple brand products for $15 million to Bottling Group (the "JLT Purchase Agreement"); (v) CSI and Carlyle Bottling agreeing to each purchase $75 million of Bottling Group's stock after the consummation of the merger (the "Second Contribution Agreement"); (vi) Cadbury Schweppes agreeing to purchase $150 million of Bottling Group's subordinated debt; (vii) Turner, Bottling Group, CSI, Carlyle Bottling, and the Turner Family Partnership entering into an agreement to retain Turner on the board of directors of the surviving entity for so long as he is employed by Bottling Group at a base salary of $900,000 including bonuses and stock options (the "Stockholders Agreement" and the "Turner Employment Agreement"); (viii) Turner receiving shares in the surviving entity which would "facilitat[e] realization of a profit by the Turner interests through an

---

**3.** The parties dispute the affiliation of Carlyle Holding to Carlyle Bottling or Carlyle. The essence of that dispute is discussed *infra*.

initial public offering of Bottling Group's stock"[4], an opportunity not afforded to other stockholders (the "Registration Rights Agreement"); (ix) Carlyle Bottling and the Turner Family Partnership agreeing that the Bottling Group stock acquired in the transactions by the Turner Family Partnership, CSI and Carlyle Bottling would be treated as a tax free exchange (the "Over Agreement"); (x) CSI and Carlyle Bottling agreeing to purchase the Holdings' stock that Turner and the Turner Family Partnership were to have redeemed in the event the Merger was enjoined (the "Contingent Stock Purchase Agreement").

As a result of all the alleged "side-deals", Turner would stand to gain a substantial equity interest in Bottling Group and Holdings and ABC would become wholly owned subsidiaries of Bottling Group.

### 3. The Fairness Opinion

In response to Cadbury's and Carlyle's agreement to pay $25 per share to acquire the shares of Holdings not owned or controlled by Turner, Holdings' board of directors engaged DLJ to evaluate the fairness of the consideration being offered.

DLJ delivered its opinion to the Holdings' board of directors at their August 30, 1999 meeting. DLJ noted that it performed three principal valuation analyses which included (1) a comparable publicly traded company analysis; (2) a comparable merger transaction analysis; and (3) a discounted cash flow analysis. DLJ drew upon these valuation analyses to conclude that the $25 per share merger consider-

ation was fair to Holdings' minority stockholders.

### 4. Board of Director Approval and the Proxy Statement

On August 30, 1999, with the DLJ opinion in hand, Holdings' director defendants unanimously approved the plan of merger and recommended it to the stockholders. On September 10, 1999, the board issued a proxy statement and scheduled a special stockholders meeting for October 6, 1999 to consider the proposed merger agreement. The full text of the DLJ fairness opinion was attached to the proxy statement. Stockholders were encouraged to read the opinion to understand how DLJ arrived at its conclusion. Minority stockholders were also informed that appraisal rights were available under the Delaware General Corporation Law ("DGCL") to the Class A Common stockholders who believed that the merger consideration did not represent a fair value.

On October 6, 1999, the stockholders voted to approve the transaction and the parties consummated the merger.

### III. THE CONTENTIONS OF THE PARTIES

Plaintiffs assert that they are entitled to rescission of the merger, rescissory damages or other equitable relief independent of, and parallel to, their right to appraisal.[5] Plaintiffs' Complaint alleges: (1) Turner, Sweezey and Hunt breached their fiduciary duties of loyalty, care, good faith[6] and disclosure; (2) the Turner Family Partnership aided and abetted the breaches of

---

4. Compl. ¶ 39(c).

5. It is important to note that all but one of the plaintiffs named in the Complaint are petitioners in the appraisal action. *Crescent/Mach I Partners, L.P. v. Dr. Pepper Bottling Co. of Texas*, Del. Ch., C.A. No. 17711,

Steele, V.C. In that action, Cede & Co., the record owner of the shares held by plaintiffs, has made a demand for appraisal.

6. Plaintiffs' brief addresses the breaches in the more user friendly analytical framework of loyalty, care and disclosure.

fiduciary duties by Turner; (3) Cadbury Schweppes, CSI, Carlyle, Carlyle Holding, Carlyle Bottling, Bottling Group, Tosca, and ABC aided and abetted the breaches of fiduciary duties by Turner, Sweezey and Hunt; (4) Holdings, Turner, Sweezey and Hunt made fraudulent representations; (5) JLT Beverages, Turner and the Turner Family Partnership unjustly enriched themselves and a constructive trust should be imposed upon their gains. Plaintiffs' Complaint also alleges that the proxy statement fails to disclose material facts necessary for an informed stockholder decision on the merger proposal.

On this motion, defendants seek to dismiss the Complaint and to stay discovery on the grounds that: (1) the Court lacks personal jurisdiction over Cadbury Schweppes, CSI, Carlyle Holding, JLT Beverages and the Turner Family Partnership under Court of Chancery Rule 12(b)(2); (2) the Complaint fails to state viable breaches of fiduciary duty claims against the director defendants for which relief could be granted under Rule 12(b)(6); (3) plaintiffs' claims are derivative in character and they no longer have standing to pursue those claims as a result of the merger; (4) the Complaint fails to state a viable aiding and abetting claim against JLT Beverages, the Turner Family Partnership and the unaffiliated defendants for which relief could be granted under 12(b)(6); (5) the Complaint fails to state a claim for fraud against Holdings and the director defendants; (6) the request for imposition of a constructive trust against JLT Beverages is inextricably linked to the derivative claims and plain-

tiffs lack standing to pursue this remedy as a result of the merger; and (7) the request for imposition of a constructive trust against Turner and the Turner Family Partnership fails because plaintiffs did not plead the underlying purported breaches of fiduciary duty claims properly.

## IV. ANALYSIS

### A. Legal Standard of Review

In evaluating Defendants' Motion to Dismiss, I assume the truth of all well-pleaded, non-conclusory allegations found in the Complaint and extend the benefit of all reasonable inferences that can be drawn from the pleadings to the non-movant, plaintiffs.[7] Before dismissing a claim, I must find that plaintiffs have either failed to plead facts supporting an element of the claim or that under no reasonable interpretation of the facts alleged in the Complaint (including all reasonable inferences) could plaintiffs state a claim for which relief might be granted.[8] Notwithstanding Delaware's permissive pleading standard, I am permitted to disregard allegations which are merely conclusory and lack factual support.[9]

### B. Standing—Direct or Derivative Claims

■ Before I begin to address the merit of plaintiffs' claims, it is important to determine whether plaintiffs' purported breaches of fiduciary duty claims are direct or derivative. Should the claims be

---

**7.** *Loudon v. Archer–Daniels–Midland Co.*, Del. Supr., 700 A.2d 135, 140 (1997).

**8.** *Delaware State Troopers Lodge v. O'Rourke*, Del. Ch., 403 A.2d 1109, 1110 (1979) ("A complaint should not be dismissed upon such a motion unless it appears to a certainty that under no set of facts which could be proved to

support the claim would the plaintiff be entitled to relief.").

**9.** *In re Walt Disney Co. Derivative Litig.*, Del. Ch., 731 A.2d 342, 353 (1998), *aff'd in part, rev'd in part sub nom. Brehm v. Eisner*, Del. Supr., No. 469, 1998, 746 A.2d 244 (2000).

classified as derivative, as defendants suggest, plaintiffs would lack standing to pursue the litigation as a result of the merger because those claims belong to the corporation, not to former stockholders.[10] If classified as a direct claim, a stockholder may bring suit for direct injuries independent of the corporation by challenging the fairness or validity of the merger even after the consummation of the merger.[11]

Defendants contend that plaintiffs' breach of fiduciary duty claims are derivative in nature.[12] They characterize plaintiffs' allegations as an attack on the fairness of the merger price; a claim better suited for resolution in an appraisal action, rather than a challenge to the fairness of the merger itself.

■ Our Supreme Court has held that "[i]n order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[13] Here, plaintiffs attack the merger by alleging that the director defendants breached their fiduciary duties by approving and recommending the merger at an unfair price resulting from an unfair process. Specifically, plaintiffs allege that Turner, as Chairman of the Board and CEO of Holdings, breached his duty of loyalty by structuring a transaction that would "freeze out minority [stockholders] for an inadequate consideration and divert to Turner and his affiliates an undue share of the value and growth potential of Holdings' business."[14] The remaining directors (Sweezey and Hunt) are alleged to have breached their duties of loyalty by acquiescing in Turner's self-interested transaction and by approving and recommending the merger to stockholders while knowing the price and the process which determined it to be unfair.

Assuming the truthfulness of these allegations with the benefit of all reasonable inferences, it is clear to me that plaintiffs' fiduciary duty claims constitute a direct challenge to the fairness of the merger itself. They are not extinguished by the merger.

---

10. *See, e.g. Parnes v. Bally Entertainment Corp.*, Del.Supr., 722 A.2d 1243, 1245 (1999) ("Since a stockholder suing derivatively is bringing a corporate claim, not a personal one, the stockholder must maintain his or her status as a stockholder in order to continue the litigation."); *Kramer v. Western Pac. Indus.*, Del.Supr., 546 A.2d 348, 354 (1988).

11. *Parnes*, at 1245; *see also Chaffin v. GNI Group, Inc.*, Del. Ch., C.A. No. 16211, mem. op. at 18–20, 1999 WL 721569, Jacobs, V.C. (Sept. 3, 1999) (plaintiffs' claims are direct because they challenge the validity of the merger and, therefore, their claims were not "extinguished" in the merger).

12. Defendants rely on *Turner v. Bernstein*, Del. Ch., C.A. No. 16190, mem. op. at 27–33, 1999 WL 66532, Jacobs, V.C. (Feb. 9, 1999) to distinguish plaintiffs breach of fiduciary duty claim as derivative. In *Turner*, the plaintiffs attempted to argue that their claims were direct based on the "cash value dilution" concept articulated in *In re Tri–Star Pictures, Inc., Litig.*, Del.Supr., 634 A.2d 319 (1993) rather than promoting *Parnes* and attacking the fairness of the merger. Vice Chancellor Jacobs held that the plaintiffs failed to plead a transaction that "question[ed] the fairness of the price offered in the merger or the manner in which the agreement was negotiated." *Id.* at 31 *citing Parnes*, 722 A.2d at 1245. He then suggested that plaintiffs' claims alleged corporate waste which is a derivative, not a direct claim. *Id.* at 33. He then dismissed plaintiffs' claim because they lacked standing after the merger to maintain an action for corporate waste. *Id.*

13. *Parnes*, 722 A.2d at 1245.

14. Compl. ¶ 49. *See also* infra at pp. 979–984.

### C. Can this Court Exercise Personal Jurisdiction over Certain Non–Resident Defendants?

#### Motion to Dismiss for Lack of Jurisdiction Under 12(b)(2)

Plaintiffs have the burden to make out a *prima facie* case establishing jurisdiction over a non-resident.[15] All allegations of fact concerning personal jurisdiction are presumed true, unless contradicted by affidavit.[16] In assessing whether this Court can exercise personal jurisdiction in a motion to dismiss under Rule 12(b)(2), Chancellor Allen noted that the burden of establishing defendants' amenability to suit is not merely restricted to the allegations contained in the complaint.[17] Rather, extra-pleading material may be used to supplement the complaint and establish jurisdiction.[18] Therefore, I am permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction.[19]

#### The Applicable Legal Standard

Defendants' Motion to Dismiss relies, in part, on the assertion that this Court lacks personal jurisdiction over certain non-resident Turner affiliates, Cadbury Schweppes, CSI and Carlyle Holding.

In order to establish this Court's jurisdiction over these non-residents, plaintiffs must satisfy a two-prong test. First, they must show that the non-resident defendants' activities fall within the parameters of Delaware's long-arm statute.[20] Section 3104(c)(1), authorizes, *inter alia*, the exercise of jurisdiction over a non-resident "who in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State."[21] Next, assuming the defendants' actions meet the 3104(c)(1) requirement, plaintiffs must establish whether the exercise of jurisdiction over the non-resident defendants comports with the requirements of the Due Process Clause of the Fourteenth Amendment—the so-called "minimum contacts" requirement.[22]

I apply the test to each defendant below.

#### 1. The Turner Affiliates

Defendants argue that neither JLT Beverages nor the Turner Family Partnership transacted any business in Delaware within the meaning of Section 3104(c)(1). Plaintiffs contend that both Turner affiliates (1) actively participated in causing Holdings' merger under Delaware law and (2) purposely availed themselves of the benefits and protections of Delaware law by entering into contracts which were contingent on the consummation of the merger. These events, plaintiffs argue, are sufficient to establish personal jurisdiction over the affiliates under Section 3104(c)(1) or in the alternative, under the conspiracy theory of personal jurisdiction.

---

15. *Hart Holding Co. Inc. v. Drexel Burnham Lambert, Inc.*, Del. Ch., 593 A.2d 535, 539 (1991).

16. *See Haisfield v. Cruver*, Del. Ch., C.A. No. 12430, mem. op. at 5, 1994 WL 497868, Steele, V.C. (Aug. 25, 1994).

17. *Hart Holding Co. Inc.*, 593 A.2d at 538–39.

18. *Id.*

19. *See Haisfield*, at 5.

20. *Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (1992).

21. 10 *Del. C.* § 3104(c)(1).

22. *See Hercules*, 611 A.2d at 480 (Delaware courts have construed the long-arm statute very broadly in order "to confer jurisdiction to the maximum extent possible under the Due Process Clause.").

**(a) Personal Jurisdiction pursuant to § 3104(c)(1)**

First, I am compelled to ask whether there are any facts alleged that JLT Beverages or the Turner Family Partnership did anything in Delaware that would constitute transacting business under Section 3104(c)(1). After review I find that the record lacks the necessary support for me to reach this conclusion.

Plaintiffs allege that JLT Beverages clearly transacted business in Delaware within the parameters of Section 3104(c)(1). Specifically, plaintiffs argue that JLT Beverages was a party to the JLT Purchase Agreement which made consummation of the merger an express condition. In addition, the Complaint alleges that without the merger, JLT Beverages would not receive $15 million from Bottling Group for its brand name rights in Deja Blue and rights under a franchise agreement with Snapple brand products. For these reasons, plaintiffs allege, JLT Beverages played an integral role in the merger.

■ I cannot find any facts supporting even a "single act" executed in Delaware by JLT Beverages that would subject it to jurisdiction under Section 3104.[23] There must be more contact with Delaware than simply entering into an agreement outside Delaware and the purview of Delaware law which happens to be contingent upon a merger of two Delaware corporations. The purely commercial reasons for which JLT Beverages may have entered into an agreement contingent upon a Delaware merger coming to fruition are entirely driven by acts outside of Delaware, do not qualify as contacts even under the most metaphysical of analyses and are not what our courts mean by a purposeful involvement with a Delaware forum sufficient to create a nexus between the commercial reasons for the agreement and forum related conduct.

Next, I turn to the allegations surrounding the Turner Family Partnership, a Texas partnership with its principal place of business in Texas. Plaintiffs allege that as a controlling stockholder of Holdings, the Turner Family Partnership directly and actively caused the Holdings merger under Delaware law. They allege that each of the agreements to which the Turner Family Partnership was a party: (1) the Turner Contribution Agreement; (2) the Over Agreement; (3) the Redemption Agreement; and (4) the JLT Purchase Agreement, were expressly conditioned on the consummation of the merger. These conditions precedent, plaintiffs maintain, prohibited the Turner Family Partnership from soliciting alternative offers that would increase the per share value obtained by each stockholder. Defendants contend, and I agree, that for the same reasons that JLT Beverages cannot be subject to the jurisdiction of this Court simply because it entered into agreements conditioned upon a merger of two Delaware corporations, neither can the Turner Family Partnership.

■ Here, the record does not indicate that significant portions of the agreements were negotiated in Delaware. Plaintiffs' conclusory allegations do not indicate any Delaware business contact that would permit me to extend jurisdiction over the Turner Family Partnership under 3104(c)(1) other than its status as a controlling stockholder in Holdings. Our Courts have already held that stock ownership of a Delaware corporation is not, without more, a sufficient contact on which to base personal jurisdiction.[24]

---

**23.** *Eudaily v. Harmon,* Del.Supr., 420 A.2d 1175 (1980) (recognizing that under section 3104(c)(1), long-arm jurisdiction can be established over non-residents on the basis of a single act or transaction engaged in by the non-resident within Delaware).

**24.** *See e.g., Papendick v. Robert Bosch GmbH,* Del.Supr., 410 A.2d 148, 152 (1979) (stock

### (b) Personal Jurisdiction under the "Conspiracy Theory"

In the alternative, plaintiffs next attempt to obtain jurisdiction over the Turner affiliates, JLT Beverages and the Turner Family Partnership, on the basis that Turner designed the merger of Holdings and Tosca, both Delaware corporations, and the agreements that related to the merger entered into by them as part of an orchestrated chain of events facilitating the breaches of fiduciary duty by which Turner could "squeeze[] out plaintiffs while diverting an undue share of the value of Holdings to himself and his affiliates."[25] This participation forms the basis for plaintiffs' alleged common law "conspiracy theory."

■ The "conspiracy theory" is not an independent jurisdictional basis. Rather, as Vice Chancellor Jacobs suggests, it is a "shorthand reference to an analytical framework where a defendant's conduct that either occurred or had a substantial effect in Delaware is attributed to a defendant who would not otherwise be amenable to jurisdiction in Delaware."[26]

■ In order to establish personal jurisdiction over a non-resident defendant under the "conspiracy theory," plaintiffs must satisfy a five part test by showing that:

(1) a conspiracy [to defraud] existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[27]

■ This theory is very narrowly construed. Plaintiffs must assert specific factual evidence, not conclusory allegations, to show that the non-resident defendants were conspirators in some wrongful act resulting in harm to Delaware entities or their owners in order for the Court to exercise jurisdiction over them.[28]

■ The specific factual allegations in a complaint that proposes to invoke the "conspiracy theory" must be more than a "facile way for [plaintiffs] to circumvent the minimum contacts requirement."[29] Plaintiffs allege that the out-of-state transactions by non-resident defendants were inextricably linked to the merger and facilitated the "side-deals" that constituted the breaches of fiduciary duty enriching Turner which were in turn sanctioned by

---

25. Pls. Answering Brief in Opposition to the Motion to Dismiss of Defendants Jim L. Turner, William O. Hunt, J. Kent Sweezey, Jim and Julie Turner Family Partnership, Ltd., and JLT Beverages, L.P. at 16. [hereinafter Pls. AB I]. *See also* Compl. ¶¶ 38, 49–52.

26. *Computer People, Inc.*, at 13–14.

ownership of a Delaware subsidiary is not, without more, a sufficient contact for which to establish jurisdiction. The contact could be sufficient where the cause of action arises from the creation and operation of the Delaware subsidiary); *Computer People, Inc. v. Best International Group, Inc.*, Del. Ch., C.A. No. 16648, mem. op. at 24, 1999 WL 288119, Jacobs, V.C. (April 27, 1999).

27. *Instituto Bancario Italiano SpA v. Hunter Eng'g Co.*, Del.Supr., 449 A.2d 210, 225 (1982).

28. *See Computer People, Inc.*, at 16 (citing *Newspan, Inc. v. Hearthstone Funding Corp*, Del. Ch., C.A. No. 13304, mem. op. at 20–21, 1994 WL 198721, Allen, C. (May 10, 1994)). The applicable wrongful acts in my view cannot be limited to fraud alone.

29. *Computer People, Inc.*, at 16. *See also HMG/Courtland Properties, Inc. v. Gray*, Del. Ch., C.A. No. 15789, mem. op. at 15–16, 729 A.2d 300, Strine, V.C. (Jan. 13, 1999).

Sweezey and Hunt. They were parties to a conspiracy that existed in the form of a plan to divert value from the plaintiffs to Turner and his affiliates through a squeeze-out merger. I find that the allegations do meet the five-part test fashioned by our Supreme Court. The merger involved two Delaware corporations under Delaware law. The Turner affiliates entered into contracts which facilitated the alleged "side-deals," which would never have occurred but for the knowledge of and planning for the Delaware merger. The act of merger, itself, was a substantial act in furtherance of the plan and it occurred in Delaware. The Affiliates, having made their contracts contingent upon the merger certainly knew that their contracts would have a substantial effect on the prosecution of the merger and the success of the Turner "side-deals." The Affiliates' participation directly affected the merger in Delaware and the ancillary available opportunities for Turner. In short, the plaintiffs adequately allege a conspiracy in which the non-Delaware defendant entities participated designed to facilitate a breach of fiduciary duties owed to minority stockholders in a Delaware corporation.

While there is no specific allegation that Turner's affiliates agreed to conspire "to defraud" minority stockholders of any consideration, it is clear that the plaintiffs satisfy the five part test necessary to invoke this Court's jurisdiction under a "conspiracy theory" because each of the allegations concerning the merger plan, (i), (iii), (iv), (vii) and (x) demonstrate a colorable claim that the Turner affiliates acted in concert with the merger players to agree to a substantial act without which the merger resulting in the benefits to Turner complained of would not have occurred.

In short, while the simple act of entering into a contract outside Delaware contingent upon the consummation of a merger in Delaware would not subject the Turner affiliates to the jurisdiction of this Court, their actions are "conduct that either occurred or had a substantial effect in Delaware" and they are amenable to this Court's jurisdiction.

### 2. Cadbury Schweppes

Defendants argue that Delaware's laws and statutes do not authorize personal jurisdiction over Cadbury Schweppes with respect to the aiding and abetting claim and that the exercise of jurisdiction over them would violate the Due Process Clause of the Fourteenth Amendment.

Cadbury Schweppes is a United Kingdom corporation. Plaintiffs allege that Cadbury Schweppes transacted business in Delaware for purposes of Section 3104(c)(1) by causing the merger of Tosca, a Delaware corporation, with and into Holdings, a Delaware corporation. In support, plaintiffs argue that Cadbury Schweppes' role in the merger is analogous to *Arnold v. Society for Savings Bancorp, Inc.*[30] and *Kahn v. Lynch Communication Sys., Inc.*[31] In both cases a "single act" was sufficient to constitute "transacting business" under Section 3104(c)(1).

Cadbury Schweppes' involvement is, however, more akin to the role played by

---

**30.** *Arnold v. Society for Savings Bancorp, Inc.,* Del. Ch., C.A. No. 12883, 1993 WL 526781, mem. op., Chandler, V.C. (Dec. 15, 1993) (holding that defendant company transacted business under 10 Del. C. § 3104(c) when it merged its subsidiary into a Delaware corporation and chose to designate the Delaware corporation as the surviving entity)

**31.** *Kahn v. Lynch Communication Sys., Inc.,* Del. Ch., C.A. No. 8748, mem. op., 1989 WL 99800, Berger, V.C. (Aug. 24, 1989) (finding that defendant was deemed to have transacted business under § 3104 by virtue of its allegedly wrongful conduct that resulted in the Delaware merger), *rev'd,* Del.Supr., 638 A.2d 1110 (1994), *and aff'd,* Del.Supr., 669 A.2d 79 (1995).

Alcatel S.A. in *Kahn*. In *Kahn*, stockholders of Lynch Communication Systems, Inc. ("Lynch"), a Delaware corporation, challenged the cash-out merger of Lynch into a subsidiary of Alcatel USA, Inc., a holding company and subsidiary of Alcatel S.A.[32] The facts and allegations in the complaint were sufficient to support a finding that Alcatel S.A. directly, or through its subsidiary, transacted business in Delaware by negotiating and consummating the merger at issue.[33] In other words, the company was directly involved in the alleged wrongful conduct that resulted in the merger.[34]

 Here, plaintiffs' Complaint alleges that Cadbury Schweppes, like Alcatel S.A., was directly involved in the alleged wrongful conduct that resulted in the merger. Most telling is the fact that the Cadbury Schweppes representatives negotiated the merger price. In the early part of 1999, representatives of Cadbury Schweppes, along with DLJ and Carlyle, met to determine if agreeable terms could be reached in consummating a business combination between ABC and Holdings. Cadbury Schweppes also agreed to provide the financing for the combined entity and committed to purchase its stock. Assuming the plaintiffs' allegations to be true, it is fair to characterize Cadbury Schweppes as having transacted business by availing itself intentionally of a Delaware forum by negotiating and consummating the merger

between two Delaware corporations under our law.

On this basis, "since a single transaction is sufficient to confer jurisdiction where the claim is based on that transaction"[35] I find that the acts Cadbury Schweppes is alleged to have committed constitute transacting business in Delaware and imply the requisite "minimum contacts" with Delaware.

### 3. CSI

I turn next to the allegations surrounding CSI, a Dutch corporation whose principal place of business is London. Plaintiffs argue that CSI is subject to personal jurisdiction in Delaware because they transacted business in Delaware for purposes of Section 3104(c)(1) by securing the benefits and protections of Delaware law to obtain a business advantage flowing from the merger. CSI's participation in the merger is the basis for the alleged aiding and abetting claims against it.

 Plaintiffs argue that CSI caused the merger by contributing its shares of ABC to Bottling Group in exchange for an equal number of Bottling Group shares (both Delaware corporations).[36] Moreover, plaintiffs allege that CSI facilitated the merger by participating in several agreements and transactions that were integral to the accomplishment of the merger and were not simply contingent upon the consummation of the merger.[37]

---

32. *Kahn*, at 8–9.

33. *Id.*

34. For example, Alcatel S.A. made the original consolidation proposal to the Lynch independent committee; made the decision to abandon the Celwave consolidation proposal; an Alcatel S.A. representative negotiated the merger price; and Alcatel S.A. designated five members to the board of directors of the Delaware corporation. *Id.* at 8.

35. *Kahn*, at 9.

36. Compl. ¶ 38(d).

37. The agreements and transactions plaintiffs argue were integral to the accomplishment of the merger and upon which consummation of the merger was contingent include: the Second Contribution Agreement; the Over Agreement; the Registration Rights Agreement; and the Contingent Stock Purchase Agreement. These agreements and transactions are discussed *supra* and are cited with references to the proxy statement.

Assuming the Complaint's allegations to be true, it is indeed fair to characterize CSI as having transacted business in Delaware. CSI has the requisite "minimum contacts" and is subject to personal jurisdiction under Section 3104(c)(1).

### 4. Carlyle Holding

 Lastly, I turn to the remaining issue of whether Carlyle Holding is subject to personal jurisdiction in this Court. The Complaint identifies Carlyle Holding as a corporation whose principal place of business is Washington D.C.

Plaintiffs allege that Carlyle Holding aided and abetted Turner "in a plan to defraud plaintiffs of the fair value of their interests in the future and continuity of Holdings and to divert to Turner assets and values that should have accrued to Holdings and to plaintiffs."[38] Plaintiffs contend, without stating how, that Carlyle Holding is affiliated with Carlyle and Carlyle Bottling and should therefore be subject to this Court's jurisdiction. However, the affidavit of Jeffrey Ferguson contradicts plaintiffs' allegations.[39] Ferguson's affidavit attests to the fact that Carlyle Holding is not a member, directly or indirectly, of Carlyle Bottling, nor has it ever been affiliated with Carlyle in any way.

For these reasons, I dismiss Carlyle Holding from this action.

### D. Breach of Fiduciary Duty Claims

 Directors have an unyielding fiduciary duty to protect the interests of the corporation and the stockholders alike.[40] In the context of a merger, a breach of fiduciary duty analysis begins with the rebuttable presumption that a board of directors acted with loyalty and care. Unless this presumption is sufficiently rebutted, I must defer to the discretion of the board and acknowledge that their decisions are entitled to the protection of the business judgment rule. In order to apply the entire fairness standard of review, plaintiffs must demonstrate that a majority of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director.[41] In my view, plaintiffs' allegations of self-interest and dominance are inadequately pleaded and do not meet the threshold necessary to rebut the presumption of the business judgment. However, as I articulate below, the factual allegations if taken as true do warrant the imposition of enhanced judicial scrutiny based upon Turner's alleged dealings in bad faith and the remaining directors acquiescence and failure to protect the interests of the corporation and the minority stockholders.

I will address the alleged breaches of fiduciary duty claims below.

### The Duty of Loyalty Claims

### 1. Do the Pleadings allege that a Majority of the Board was Disinterested and Incapable of Exercising Independent Judgment?

Defendants argue that plaintiffs plead no facts supporting the breach of the duty of loyalty claims that would justify depriving the three-member board of the protection of the business judgment rule. After evaluating plaintiffs' allegations, I do find that plaintiffs have not sufficiently pleaded facts that demonstrate that the director

---

**38.** Compl. ¶ 34.

**39.** Mr. Ferguson is employed as an in-house attorney of The Carlyle Group, L.P. His affidavit was provided to the Court by the unaffiliated defendants.

**40.** *Cede & Co. v. Technicolor, Inc.* Del.Supr., 634 A.2d 345, 360 (1993) (*Cede II*).

**41.** *See Grobow v. Perot*, Del.Supr., 539 A.2d 180, 188 (1988); *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1168 (1995).

defendants were interested and/or lacked independence when they approved the merger agreement that allegedly conferred substantial benefits on Turner which were not available to the remaining stockholders.

The Complaint alleges that two of the three directors who approved the merger agreement received a personal benefit from the transaction not received by other stockholders. The plaintiffs allege that a majority of disinterested directors did not approve the merger and, as a consequence, defendants must demonstrate the merger to be entirely fair. The facts pleaded do not support this contention. The contention that the three-member board can not rely upon the benefit of the business judgment rule first rests on the theory that the majority of directors were financially interested in the transaction and had a material interest in approving the merger agreement. Second, in the absence of evidence of a direct financial benefit, plaintiffs contend that Turner, the sole interested director, dominated and controlled the other two members of the board.

### (a) Sweezey

■ The Complaint fails to state a cognizable claim that Sweezey personally benefited from the merger in a manner that was not enjoyed by the other stockholders. Sweezey was a Managing Director of DLJ, Holdings financial advisor. Under the terms of the merger, DLJ was to receive compensation for its efforts in orchestrating the merger. It cannot be reasonably inferred from this fact alone that Sweezey acted self-interestedly.[42] In other words,

his self-interest did not preclude his ability to independently evaluate the fairness of the merger agreement. Sweezey and DLJ's interests were completely aligned with the interests of the stockholders in attempting to maximize the value of the interest of the corporation and the stockholders. There are no well-pleaded allegations of financial interest other than the compensation paid to his firm, DLJ, for their work.

### (b) Hunt

■ The allegations of Hunt's material interest in the Merger are wholly conclusory and even under the most strained of inferences would not survive a motion to dismiss. They are wholly conclusory for the following reasons. First, the Complaint alleges that Hunt has a beneficial interest in the merger's consummation. Neither plaintiffs' pleadings nor briefs suggest anything further in support of that bald allegation. In fact, plaintiffs concede their failure to plead specific factual allegations to support the allegation concerning his material interest and request leave to explore Hunt's financial interest through further discovery. Conclusory allegations that are pleaded without supporting facts "cannot be the platform for launching an extensive litigious fishing expedition for facts through discovery in the hopes of finding something to support them."[43] Second, plaintiffs assert that Turner dominated and controlled Hunt. In support, they allege that Turner controls Hunt because of their long-standing 15-year professional and personal relationship. This allegation alone fails to raise a

---

**42.** *See State of Wisconsin Investment Board v. Bartlett,* Del. Ch., C.A. No. 17727, mem. op. at 18–19, 2000 WL 238026, Steele, V.C. (Feb. 24, 2000) ("[o]ne director's alleged interest, as here in a fee related to consummation of the merger, related to his work and tied to overall enhancement in the value of the merger transaction is simply not enough to man-

date strict scrutiny of the [ ] board's actions.") The alleged self-interested director had every reason to negotiate the highest consideration possible for the stockholders. *Id.*

**43.** *Nebenzahl v. Miller,* Del. Ch., C.A. No. 13206, mem. op. at 8, 1996 WL 494913, Steele, V.C. (Aug. 26, 1996).

reasonable doubt that Hunt could not exercise his independent business judgment in approving the transaction.[44] Therefore, these allegations lack the specific factual predicate which would permit their survival from the attack of a motion to dismiss.

Accordingly, I find that two of Holdings' three directors were disinterested and independent. With no pleaded facts adequately supporting a claim that the majority of the directors were either self-interested or dominated by an interested party, I would normally dismiss the breach of the duty of loyalty claim. However, plaintiffs' Complaint alleges bad faith on the part of Turner and the remaining director defendants which is pleaded sufficiently and would rebut the presumptive validity of the board's business judgment even in the absence of a tainted majority.

## 2. Indifference to a Duty of Loyalty to the Corporation and its Minority Stockholders

██ Although the majority of the directors were disinterested and independent, the presumptive validity of the business judgment rule can be rebutted "where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." [45] Here, in my view, the presumption has been sufficiently rebutted by pleaded facts evidencing the remaining directors' "indifference to their duty to protect the interests of the corporation and its minority stockholders." [46]

The Supreme Court found the facts alleged in the *Parnes'* complaint sufficient to rebut the presumption under a "bad faith" standard. Parnes, a stockholder of Bally Entertainment Corporation, brought an action against Bally, its board of directors and Hilton Hotels Corporation alleging that Bally's directors breached their fiduciary duties by entering into a merger agreement with Hilton Hotels that paid Bally's stockholders an unfair price derived as a result of unfair dealing. Allegedly, Arthur M. Goldberg, Bally's Chairman, Chief Executive Officer and front-man in the merger negotiations demanded and required, as a condition of his consent to any acquirer of Bally, a substantial transfer of Bally's assets and substantial financial remuneration.[47] Hilton, deter-

---

44. *See In re Grace Energy Corp. Stockholders Litig.*, Del. Ch., C.A. No. 12464, mem. op. at 10, 1992 WL 145001, Hartnett, V.C. (June 26, 1992) (conclusory allegations of "personal affinity" are not sufficient to establish director interest); *Benerofe v. Cha*, Del. Ch., C.A. No. 14614, mem. op. at 6, 1998 WL 83081 (conclusory allegations of long-standing friendship is not enough to raise a reasonable doubt that a director could exercise his independent business judgment).

45. *Parnes*, 722 A.2d at 1246.

46. *Strassburger v. Earley*, Del. Ch., 752 A.2d 557, 581 (2000).

47. Among the many demands agreed to by Hilton, were:
 (1) a termination payment of $21 million (which exceeds the amount arguably due to Goldberg by approximately $14.4 million); (2) a transfer to Goldberg for $250,000 of a warrant worth $5 million for the purchase of 20% of Bally Total Fitness Holding Corporation's common stock and the forgiveness of $15.2 million of Bally Fitness indebtedness to Bally; (3) the merger of Bally's Casino Holdings, Inc., a shell corporation, into Bally and the conversion of the Casino Holdings preferred stock, all owned by Goldberg, into Bally and Bally Total Fitness stock worth approximately $43 million; (4) the transfer to Goldberg of 20% of Bally's interest in a Maryland race track project; and (5) the transfer to Goldberg of 40% of Bally's interest in a proposed Mexican gaming venture.
 *Parnes*, 722 A.2d at 1246.

mined to form a business combination with Bally, agreed to Goldberg's demands. The complaint alleged breaches of the duty of loyalty on the part of Goldberg by personally benefiting at the expense of Bally and its stockholders and the Bally board of directors for acquiescing in Goldberg's self-interested negotiations and approving the merger at an unfair price. Accepting the factual allegations as true, the Supreme Court, under a "good faith" standard, held that the *Parnes'* complaint stated a claim upon which relief could be granted in its challenge to both the price received in the transaction and the fairness of the process which led to the directors approval of the transaction.

I find similar factual allegations in plaintiffs' Complaint. Turner, like Goldberg, has negotiated a merger agreement that conferred substantial benefits to him that will not be available to Holdings' minority stockholders. The allegations as framed in the Complaint suggest that Turner may have breached his fiduciary duty of loyalty.[48] It may be inferred from plaintiffs' allegations in the Complaint that Sweezey and Hunt may have breached their fiduciary duty of loyalty "by acquiescing in [Turner's] self-interested negotiations and by approving the merger at an unfair price."[49] In other words, it does not matter here that the Complaint fails to establish that Sweezey and Hunt were either interested directors or that they lacked the ability to form an independent judgment. Their approval of Turner's alleged self-interested "side-deals" allegedly taint the entire merger process and strips the board of the protection of the business judgment rule. Even though the remaining directors failed to benefit personally from the merger, their judgments were

---

48. Plaintiffs' Complaint alleges that Turner breached his fiduciary duties to plaintiffs by: (a) demanding and obtaining equity in the surviving corporation without securing minority stockholders a proportionate opportunity to obtain equity in the surviving corporation; (b) diverting cash consideration to JLT Beverages that should have been part of the merger consideration; (c) negotiating employment contracts for himself that diverted consideration that should have been paid to all Holdings stockholders; (d) securing a right to sell his own shares that was not offered on proportionate terms to the plaintiffs; (e) obtaining tax advantages in the merger that were unavailable to plaintiffs by exchanging Holdings stock owned by the Turner Family Partnership for Bottling Group stock; (f) failing to make full and fair disclosure concerning the plan of merger; and (g) failing to make full and fair disclosure concerning the establishment and operations of JLT Beverages. Compl. ¶ 70.

49. *Parnes*, 722 A.2d at 1246. In this case, plaintiffs' Complaint alleges that the directors: (a) fail[ed] to insist on according all stockholders an equal opportunity to participate in the continuing enterprise; (b) agree[d] to the diversion of assets and consideration to Turner that, in equity, should have been shared with all Holdings' stockholders in proportion to their stock ownership; (c) fail[ed] to secure the best possible price for Holdings; (d) fail[ed] to solicit offers or alternative transactions from parties other than Cadbury Schweppes and Carlyle; (e) fail[ed] to provide alternative market checks on the fairness and reasonableness of the plan of merger; (f) fail[ed] to secure an independent fairness opinion; (g) approve[ed] the patently interested and defective DLJ opinion; (h) issu[ed] a deceptive and misleading proxy statement; (i) with[held] material information; (j) fail[ed] to allow stockholders reasonable time to evaluate the plan of merger; (k) refus[ed] to meet with concerned minority stockholders to explain the basis for their recommendation of the plan of merger except under unreasonable restrictions; and (*l*) impose[ed] burdens and obstacles that deprived minority stockholders of a fair opportunity to determine how they should vote on the plan of merger. Compl. ¶ 71.

aligned with that of Turner and not that of Holdings or its minority stockholders.[50] As Vice Chancellor Jacobs stated in *Strassburger*, the remaining directors "acted intentionally and in bad faith to enable [the majority shareholder] wrongfully to benefit at the corporation's expense."[51] The Complaint adequately pleads a claim that Sweezey and Hunt failed to exercise, in good faith, their fiduciary duty of loyalty to Holdings and the minority stockholders.

After evaluating defendants' motion to dismiss plaintiffs' duty of loyalty claim, I conclude that the allegations contained in plaintiffs' Complaint, if true, support a claim that Sweezey and Hunt breached their duty of loyalty and aided and abetted Turner's breach of his duty of loyalty. Accordingly, I deny defendants' motion to dismiss plaintiffs' duty of loyalty claims and hold that plaintiffs' Complaint has sufficiently pled non-conclusory allegations challenging the fairness of the price received in the merger and the process which led to the directors' approval.

There are, however, specific unsupported allegations that should be dismissed in order to narrow the parameters of this litigation. I will discuss those allegations in detail below.

■ I first turn to plaintiffs' allegation that the directors breached their duty of loyalty by failing to allow the stockholders "reasonable time to evaluate the merger."[52] Defendants argue, and I agree, that the proxy statement was mailed in accordance with Delaware notice requirements. Holdings' stockholders received the proxy statement 26 days before the October 6, 1999 special stockholders meeting. Delaware corporation law only requires that corporations provide notice of the time, place and purpose of the special meeting at least 20 days prior to the date of the meeting.[53] Accordingly, this claim is dismissed because the stockholders had ample time to evaluate the plan of merger contemplated in the proxy solicitation as a matter of law.

■ Next, plaintiffs allege that the directors breached their duty of loyalty by refusing to meet with minority stockholders to explain the basis for their recommendation of the merger. I know of no Delaware authority which requires anything more than a timely mailed proxy statement indicating the time, place and purpose of the stockholders meeting. This allegation is dismissed.

Finally, plaintiffs allege that the directors breached their fiduciary duty of loyalty by "imposing burdens and obstacles that deprived minority stockholders of a fair opportunity to determine how they should vote on the plan of merger."[54] This allegation is wholly conclusory. After thoroughly reviewing the Complaint I find no specific factual allegations to support this claim. It must be dismissed.

### The Duty of Care Claims

The director defendants next argue that the allegations supporting plaintiffs' duty of care claims are wholly conclusory and their approval of the merger agreement

50. *See Strassburger*, at 581 (implicating the breach of the duty of loyalty not by proof of director self-interest or dependence rather, by the remaining directors approving a transaction which benefited the majority stockholder to the detriment of the minority stockholders). Vice Chancellor Jacobs held that the remaining directors "gave priority to [the controlling stockholder's] interest, and ignored their fiduciary obligation as Ridgewood directors to assure that *all* Ridgewood stockholders would be treated fairly." *Id.*

51. *Id.*

52. Compl. ¶ 71(j).

53. 8 *Del. C.* § 251(c).

54. Compl. ¶ 71(*l*).

should be reviewed with deference to the business judgment rule.

Our Courts, in applying the business judgment rule, will presume that directors take care to be informed in good faith.[55] To overcome the presumption of the business judgment rule, plaintiffs bear the burden to show that the defendant directors failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis.[56] In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule. For the reasons stated below, I find that the Complaint insufficiently pleads a *prima facie* claim demonstrating that the board failed to inform itself adequately when it approved the merger agreement.

Assuming the facts are true, the Complaint alleges that the director defendants acted with gross negligence in: (1) failing to secure an independent fairness opinion; (2) approving an allegedly interested and defective DLJ opinion; (3) issuing a deceptive and misleading proxy statement; (4) not seeking alternative market checks on the fairness and reasonableness of the merger; (5) failing to secure the best possible price for Holdings; and (6) failing to solicit offers or alternative transactions from parties other than Cadbury Schweppes and Carlyle. Each of these allegations are addressed below.

First, plaintiffs' Complaint alleges that the director defendants' breached their fiduciary duty of care by failing to secure an independent and qualified expert to evaluate the fairness of the merger consideration. The director defendants submit that plaintiffs' allegation ignores the role played by DLJ as financial advisor to Holdings. Furthermore, defendants contend they had no duty to obtain a fairness opinion in the first place. I agree with the director defendants and dismiss these allegations.

The director defendants decided to hire DLJ, a nationally recognized investment banking firm, as an independent financial advisor to evaluate the fairness of the merger consideration. Relying on the DLJ fairness opinion to make an informed decision on whether or not to consummate the merger, the director defendants approved the merger plan and recommended it to the stockholders for their approval. Plaintiffs contend that DLJ's opinion was influenced by its financial interest in the consummation of the merger and by Sweezey's role as the Managing Director. However, plaintiffs provide nothing more than conclusory allegations that DLJ was motivated by personal interests. Rather, they suggest that the mere existence of Sweezey's affiliation with DLJ is enough to taint the process. This does not constitute a breach of the duty of care for the following reasons. First, DLJ was entitled to compensation for its efforts in consummating the merger transaction. There is nothing in the record to suggest that this compensation was excessive or extraordinary. Second, plaintiffs' fail to plead any allegations that DLJ's or Sweezey's interest in the merger was not completely aligned with that of the stockholders in attempting to maximize the value of the interest of the corporation. Third, fairness opinions prepared by independent investment bankers are generally not essential, as a matter of law, to support an informed business judgment.[57] Yet, the

**55.** *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

**56.** *Id.*

**57.** *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 876 (1985).

challenged directors obtained an evaluation of the $25 per share consideration offered by Cadbury and Carlyle from an investment banking firm and fully disclosed that fact in the proxy statement.

In this circumstance, I fail to see how the director defendants' approval of the independent fairness opinion rises to the level of grossly negligent conduct that would deprive them of the benefit of the business judgment rule. This challenge to the director defendants' exercise of due care is dismissed.

Next, plaintiffs strained allegation that the director defendants "breached their fiduciary duties" by approving an allegedly defective DLJ opinion and issuing a deceptive and misleading proxy statement is equally conclusory. Section 141(e) of Delaware's corporation law provides that directors are protected from a breach of the duty of care "when the directors reasonably believe the information upon which they rely has been presented by an expert 'selected with reasonable care' and is within that person's 'professional or expert competence.' "[58] Therefore, to overcome the presumption that the director defendants acted on an informed basis plaintiffs must show gross negligence.[59]

The plaintiffs offer no evidence, other than conclusory allegations, to support either allegation. The record reflects the following facts. DLJ was selected by the director defendants to evaluate the fairness of the $25 per share merger consideration. On August 30, 1999, DLJ delivered its opinion to the director defendants maintaining that the merger consideration was fair, from a financial point of view. In arriving at its opinion, DLJ relied upon and assumed the accuracy, completeness

and fairness of all of the financial information that was available to it from public sources or provided to it by Holdings or its representatives. The full text of its opinion was then fully disclosed to the Holdings' stockholders, including the information reviewed, assumptions made and the valuation rendered. I fail to see, under these facts and in the absence of any specific factual allegation, how the director defendants' breached their duty of care. Even if I were to accept plaintiffs' particular allegations as true, the director defendants are not obligated to do anything more in order to fulfill their duty of care than rely on a fairness opinion prepared for and requested by the directors and fully disclose it to the stockholders. Plaintiffs simply have not shown a reasonable probability that they can prove the director defendants acted hastily or in an uninformed fashion both in approving the DLJ opinion and issuing the proxy statement.

Next, plaintiffs allege that the director defendants failed to secure the best possible price for Holdings' stockholders and failed to canvass the market or solicit alternative offers from parties other than Cadbury Schweppes and Carlyle once the decision was made to cash-out the minority stockholders. The director defendants urge dismissal of these claims arguing that their duties to canvass the market or auction Holdings do not attach to this transaction under *Revlon*.[60] I dismiss these particular allegations for the reasons articulated below.

■ Generally, when a board of directors is considering a single offer fairness requires a canvass of the market to determine if higher bids can be elicited.[61]

**58.** *In re Cheyenne Software, Inc., Stockholders Litig.*, Del. Ch., C.A. No. 14941, 1996 WL 652765, at *2, Chandler, V.C. (Nov. 7, 1996).

**59.** *Smith*, 488 A.2d at 876.

**60.** *Revlon, Inc. v. MacAndrews & Forbes Holdings*, Del.Supr., 506 A.2d 173 (1986).

**61.** *Barkan v. Amsted Industries, Inc.*, Del. Supr., 567 A.2d 1279, 1286–87 (1989).

However, if the directors possess a body of reliable evidence with which to evaluate the fairness of the transaction they are permitted to approve the transaction without conducting a canvass of the market.[62]

▪ Here, the plaintiffs allege that the director defendants failed to seek the best possible price through a formal auction process. In essence, plaintiffs' argue that Turner and the remaining members of the board of directors owed the minority a fiduciary duty to auction Holdings based on our Supreme Court's holding in *Revlon*.[63] Turner, however, as majority shareholder owning 61.5% of the issued and outstanding shares of common stock, could have thwarted any effort by the director defendants to auction the company.[64] Thus, any effort to auction the company would have been futile given Turner's majority interest. Even if the director defendants were subject to *Revlon* duties, plaintiffs' Complaint fails to indicate how the directors' abdicated their fiduciary duties by failing to accumulate a reliable body of evidence with which to evaluate the fairness of the transaction.

The director defendants relied on what they considered to be DLJ's fair and complete financial evaluation of Holdings and sought its recommendation concerning the fairness of both the merger process and the merger consideration. DLJ considered the only bid for Holdings which was the result of a joint effort between Cadbury Schweppes and Carlyle. The effect of this joint effort was to merge Tosca, a wholly owned subsidiary of Bottling Group, with and into Holdings, the surviving entity. The merger would eventually permit Cadbury Schweppes and Carlyle to pursue a combination of ABC and Holdings, two of the largest independent and franchised soft-drink bottlers of Dr. Pepper and Seven–Up brand products in the United States, under the ownership of Bottling Group. It appears that the focus of plaintiffs' allegations is directed more towards DLJ's investigation into the value of Holdings rather than on the directors' knowledge of the company's value. While approving a "faulty investigation might constitute a breach of other fiduciary duties owed by directors under more general principles, that conduct dies not constitute a breach of Revlon duties."[65] Based on these allegations I can not conclude, even under the most strained of inferences, that the director defendants acted in a grossly negligent manner. Plaintiffs' duty of care allegations are dismissed.

Thus, I conclude that the director defendants met their duty of care by informing themselves adequately and that the real focus of this case is scrutiny of their actions in terms of an alleged lack of good faith in discharging their duty of loyalty. Accordingly, the director defendants' motion to dismiss the breach of duty of care claims is granted.

### Plaintiffs' Disclosure Claims

▪ The fiduciary duty of disclosure arises as a subset of a director's fiduciary duties of loyalty and care.[66] A claim for breach of the fiduciary duty of

**62.** *Id.* at 1286–87.

**63.** *Revlon*, 506 A.2d at 173.

**64.** *See Bershad v. Curtiss–Wright Corp.*, Del. Supr., 535 A.2d 840, 845 (1987) ("from Dorr–Oliver's standpoint its directors could not have assumed the role of auctioneers after the merger decision was made. That would have been futile. Curtiss–Wright owned approximately 65% of Dorr–Oliver, and could thwart any effort by Dorr–Oliver directors to auction the company.").

**65.** *In re Wheelabrator Technologies Inc. Shareholders Litig.*, Del. Ch., C.A. No. 11495, 1992 WL 212595, at *9 Jacobs, V.C. (Sept. 1, 1992).

**66.** *Malone v. Brincat*, Del.Supr., 722 A.2d 5, 11 (1998).

disclosure can implicate the duty of care when the misstatement or omission was made as a result of the directors' good faith, but "erroneous judgment" concerning the proper scope and content of the disclosure.[67] On the other hand, an alleged violation of the duty of loyalty is implicated where the required disclosure was made in "bad faith, knowingly or intentionally."[68] It is imperative that a board seeking stockholder approval of a specific corporate action disclose all material facts relating to the requested action so that stockholders can make an informed decision.[69] I am satisfied that at this stage of the proceedings, that plaintiffs' Complaint states sufficient factual support for the allegation that Holdings' directors violated their fiduciary duty of disclosure.

 To state an actionable claim for breach of the duty to disclose on the basis of an omission, plaintiffs must plead facts identifying (1) material, (2) reasonably available, (3) information that, (4) was omitted from the proxy materials.[70] If plaintiffs request something more than just nominal damages, the Complaint must allege facts sufficient to support that request.[71]

In this case, plaintiffs' Complaint satisfies all of the elements necessary to survive a motion to dismiss for breach of the fiduciary duty of disclosure.

 The Complaint alleges that the proxy statement[72] "fails to provide full and fair disclosure of material facts necessary to enable plaintiffs to make an informed decision concerning the merger."[73] In addition, the Complaint alleges that Turner, Sweezey and Hunt, as directors of Holdings, issued a proxy statement that materially misled stockholders by failing to disclose material facts within their control and knowledge.[74] Plaintiffs contend that the alleged omissions fail to address their concern about the fairness of the merger and the alleged benefits procured by Turner during its consummation. Specifically, plaintiffs aver that the board failed to disclose information of: (i) the details surrounding the DLJ fairness opinion; (ii) the terms of Turner's employment contract; (iii) the terms of the "side-deals" in which Turner and his affiliates allegedly received separate benefits; (iv) the facts and circumstances surrounding the formation of JLT Beverages; and (v) the terms of the arrangements existing between JLT Beverages and Holdings.

In response, defendants contend that plaintiffs' allegations are mere conclusory statements unsubstantiated by any supporting facts. They argue that plaintiffs fail to demonstrate how the alleged misleading statements and omissions of material facts would alter the "total mix" of information made available to the stockholders.

 "Directors are required to provide stockholders with all information that is material to the action being requested and to provide a balanced, truthful account of all matters disclosed in the communications with stockholders."[75] Thus, the

67. O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 915 (1999).

68. Id.

69. Malone, 722 A.2d at 12.

70. O'Reilly, 745 A.2d at 926.

71. Id.

72. Holdings issued the proxy statement on September 10, 1999, soliciting stockholder approval in connection with the merger proposal.

73. Compl. ¶ 66.

74. Compl. ¶ 75–79.

75. Malone, at 12 (citing Zirn v. VLI Corp., Del.Supr., 681 A.2d 1050, 1056 (1996)).

standard for determining whether an omission or misrepresentation is material is whether there is a substantial likelihood that a reasonable stockholder would consider the fact as having significantly altered the "total mix" of information made available.[76] This Court does not defer to directors' judgment about what information is material. Rather, it is a matter for the Court to determine from the record at the particular stage of a case when the issue arises.[77]

Applying the materiality standard, I conclude that plaintiffs have sufficiently pled that the alleged omissions are material. It would be impracticable and imprudent on a motion to dismiss to attempt to conclude with finality that the alleged omissions represent information that a reasonable stockholder would not consider to have significantly altered the "total mix" of information made available. The part of the motion seeking to dismiss the duty of disclosure claim is denied.

### E. The Fraud Claim

Plaintiffs contend that the inadequacies of the proxy statement also form a basis for a claim for fraud against Holdings and the director defendants. I cannot agree.

 A claim of fraud requires:

(1) a false representation, usually one of fact, made by the defendant;

(2) the defendant's knowledge or belief that the representation was false, or made with reckless indifference to the truth;

(3) an intent to induce the plaintiff to act or to refrain from acting;

(4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

(5) damage to the plaintiff as a result of such reliance.[78]

Defendants argue, and I agree, that the plaintiffs failed to plead their fraud-based claims with the particularity required under Court of Chancery Rule 9(b). Plaintiffs argue they have met the particularity requirement by setting forth in detail the alleged misrepresentations and omissions in the proxy statement. Plaintiffs claim that they relied on a misleading publication in deciding whether to approve the merger or to seek appraisal.

 Rule (9)(b) mandates that the allegations or circumstances constituting fraud be stated with particularity.[79] In other words, a well pleaded fraud allegation must include at least "the time, place and contents of the false representations...and what [was] obtained thereby."[80] No such facts appear in plaintiffs' Complaint. I note that the plaintiffs argue that they cannot sufficiently articulate their fraud-based claims without seeking discovery from the defendants, who allegedly possess the information forming the basis for their claim. For me to permit this kind of conclusory allegation in the absence of any particularized facts is contrary to the limitations of Rule 9(b). Moreover, plaintiffs' suggestion that their allegations cannot be fully articulated in the absence of discovery belies the fraud-based pleading standard. I know of no Delaware precedent that permits a conclusory allegation to proceed on the basis that

**76.** *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 943 (1985) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

**77.** *In re Anderson, Clayton Stockholders Litig.,* Del. Ch., 519 A.2d 669, 675 (1986).

**78.** *Gaffin v. Teledyn, Inc.,* Del.Supr., 611 A.2d 467, 472 (1992).

**79.** Ch. Ct. R. 9(b).

**80.** *Smith v. Smitty McGee's, Inc.,* Del. Ch., C.A. No. 15668, 1998 WL 246681, at *5, Steele, V.C. (May 8, 1998).

later discovery will fill in the purported gaps if only the pleading is allowed to survive a motion to dismiss.

For the reasons stated above, defendants' motion to dismiss plaintiffs' claims for fraud against Holdings and the director defendants is granted.

### F. Aiding and Abetting the Breaches of Fiduciary Duties

■■■ To state an actionable aiding and abetting claim, plaintiffs must plead: (1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach.[81] Plaintiffs allege that Cadbury Schweppes, CSI, Carlyle Bottling, Carlyle, ABC, Bottling Group, and Tosca aided and abetted breach of the fiduciary duties owed to plaintiffs.

Regarding the first two elements of the aiding and abetting test, plaintiffs allege that the director defendants breached their fiduciary duties of loyalty, care and disclosure in negotiating and approving the merger. The specifics of these alleged fiduciary breaches are described above and in general involve allegations that Holdings' directors effected the merger in bad faith which they disguised in a misleading proxy statement. Plaintiffs claim that each of the alleged aiders and abettors was an essential participant in the merger and knew that Turner planned to use the merger to divert wrongfully Holdings' assets to himself at the expense of Holdings'

minority stockholders. Because I have determined that plaintiffs' Complaint states a viable claim for breaches of the fiduciary duties of loyalty and disclosure against the director defendants, the aiding and abetting claims against the non-fiduciaries must be addressed.[82] Therefore, I will address below each defendant the plaintiffs have charged with aiding and abetting.

### 1. Cadbury Schweppes and Carlyle

Cadbury Schweppes and Carlyle argue that the Complaint does not factually support their knowing participation in other defendants' breaches of fiduciary duty but merely alleges their purported involvement in the merger. Plaintiffs contend the Complaint adequately states aiding and abetting claims because Cadbury Schweppes and Carlyle approached Turner with the idea of combining Holdings and ABC. The complaint states that:

> Turner, Cadbury Schweppes and Carlyle formulated nearly a dozen contracts implementing the plan of merger ... This plan was agreed to for the purpose, and would have the effect, of diverting consideration to Turner that should, in equity, be shared among Holdings' stockholders in proportion to their interests.[83]

■■■ Among the many cases cited by plaintiffs,[84] they argue that this case is analogous to *In re USACafes, L.P. Litig.*[85], where this Court found that the plaintiff

---

81. *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1344 (1987).

82. *See, e.g., Yanow v. Scientific Leasing, Inc.*, Del. Ch., C.A. No. 9536, mem. op. at 25, 1991 WL 165304, Jacobs, V.C., (July 31, 1991).

83. Compl. ¶ 51.

84. *In re Shoe-Town, Inc. Stockholder Litig.*, Del. Ch., C.A. No. 9483, 1990 WL 13475, Chandler, V.C., mem. op. at 19–20 (February 12, 1990) (dismissing aiding and abetting

claim against financier of LBO where complaint described classic arm's length bargaining even though management directors would continue as stockholders); *Katell v. Morgan Stanley Group, Inc.*, Del. Ch., C.A. No. 12343, Chandler, V.C., mem. op. at 17, 1993 WL 10871 (Jan. 14, 1993), (dismissing aiding and abetting claim because plaintiffs failed to allege inherently wrongful conduct from which knowing participation could be inferred).

85. Del. Ch., 600 A.2d 43, 55–56 (1991).

stated an aiding and abetting claim by alleging that a buyer "knowingly [went] along with a diversion of money." [86] Cadbury Schweppes and Carlyle contend that plaintiffs' reliance on *USACafes* is unavailing because the "side payments" alleged in *USACafes* were so large and egregious that it was impossible for the buyer to not know what was occurring.[87] Defendants contend that, in contrast, it was not inherently wrong for Turner to enter into a contract paying him $900,000 a year to continue his employment with the combined entity or for him to have a "small" equity interest in the combined entity. The gist of the Cadbury Schweppes and Carlyle argument is that since Turner's alleged "side-deals" were only a very small fraction of the total merger consideration, knowledge of the purported fiduciary breaches can not fairly be imputed to Cadbury Schweppes or Carlyle. Conversely, plaintiffs allege that Cadbury Schweppes and Carlyle had actual knowledge of Turner's demand for "side-deals", and therefore there is no need to debate whether it is appropriate to impute knowledge.[88]

██ "[A] court may infer a non-fiduciary's knowing participation only if a fiduciary breaches its duty in an inherently wrongful manner, and the plaintiff alleges *specific* facts from which that court could reasonably infer knowledge of the breach." [89] Did plaintiffs' Complaint adequately plead specific facts that Cadbury Schweppes and Carlyle knowingly participated? Here, in my view, they did. The claim is adequately pleaded. The question of whether it is fair to impute knowledge that Turner's "side-deals" were unfair to other stockholders because of their value

in relation to the total merger consideration will be resolved by the trier of fact. Accordingly, defendants' motion to dismiss this claim is denied.

### 2. The Unaffiliated Defendants

Plaintiffs have not alleged facts sufficient to state a claim against Bottling Group, CSI, Carlyle Bottling, ABC and Tosca for aiding and abetting breaches of fiduciary duty. Plaintiffs fail to allege facts that if true would show that each of the defendants knowingly participated in a breach.

Defendants argue that the allegations of participation in and knowledge of the alleged breaches of duty fail to set forth in any way how each of the unaffiliated defendants are connected to the challenged merger. Plaintiffs seek to establish that each of the remaining defendants (1) were essential participants in causing the merger and (2) knew that Turner intended to use the merger to divert consideration to himself that belonged to the stockholders at Holdings. Plaintiffs' claims focus on the agreements that were entered into for purposes of exchanging shares of stock for shares in the surviving entity or for registering shares in the surviving entity and simply suggest that Cadbury Schweppes and Carlyle's alleged knowledge could be imputed to the unaffiliated defendants.

However, I find no well-pleaded facts to support imputing knowledge of wrongdoing by Cadbury Schweppes and Carlyle to Bottling Group, CSI, Carlyle Bottling, ABC, and Tosca. On balance, there are no pleaded facts which could support a finding that Cadbury Schweppes or Carlyle either independently or as agents did or

---

**86.** *Id.* at 56.

**87.** *See id.*

**88.** *See* Compl. ¶ 50 (alleging "Turner informed Cadbury Schweppes and Carlyle that he would not consent to any transfer of Hold-

ings' business unless he and his affiliates received special treatment in the transaction.").

**89.** *Jackson Nat'l Life Ins. Co. v. Kennedy,* Del. Ch., 741 A.2d 377, 392 (1999) (emphasis added).

could acquire the knowledge plaintiffs seek to impute to them for these defendants. For these reasons, defendants' motion to dismiss the aiding and abetting claims against the unaffiliated defendants is granted.

### G. Imposition of Constructive Trust

Plaintiffs' Complaint requests imposition of a constructive trust because Turner will be unjustly enriched at the expense of the minority stockholders of Holdings. A constructive trust is simply one of many conceivable alternative remedies which might be available after trial should plaintiffs prevail on one or more of their theories of recovery.

Because I find that some of plaintiffs' claims are well pleaded, I deny defendants' motion to dismiss the request for imposition of the remedy of a constructive trust. The plaintiffs will be able to present evidence purportedly supporting imposition of a constructive trust if this action survives disposition at the pretrial stage.

### H. Is Rescission an Appropriate Remedy?

Plaintiffs seek rescission of the merger or alternatively, rescissory damages as a remedy for the alleged breaches of fiduciary duty by Holdings' directors. Defendants argue that the appraisal action, pending in this Court, is the sole, appropriate form of relief.

Although plaintiffs challenge the fairness of the merger, actual rescission is impractical. Defendants argue that appraisal is the exclusive remedy for plaintiffs' Complaint because the plaintiffs challenge to the merger does not plead a claim that appraisal could not remedy.[90] In other words, the Complaint merely alleges the unfairness of the $25 per share merger price offered to all stockholders including plaintiffs.

I can not, as defendants suggest, determine that appraisal or rescissory damages are the exclusive remedies available to plaintiffs. In response to a motion to dismiss, I simply determine whether plaintiff has stated a claim for which relief might be granted.[91] If I find that plaintiffs have stated cognizable claims, then "the nature of that relief is not relevant and need not be addressed."[92] Because the determination of relief is beyond the scope of this motion and premature without an established evidentiary record, I will not address this issue.

## IV. CONCLUSION

For the reasons articulated above, defendants' motion to dismiss is *granted* in part and *denied* in part.

---

**90.** *See supra* n. 5.

**91.** *Delaware State Troopers Lodge,* at 1110 ("A complaint should not be dismissed upon such a motion unless it appears to a certainty that under no set of facts which could be proved to support the claim would the plaintiff be entitled to relief.").

**92.** *Chaffin,* at 17.