# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALAN KAHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12498-VCG |
| | ) | |
| MICHAEL D. STERN, EDWARD A. | ) | |
| STERN, JOSEPH P. DALY, JOHN W. | ) | |
| POLING and JEFFREY P. BACHER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 11, 2017
Date Decided:  August 28, 2017

Larry R. Wood, Jr., David A. Dorey, Adam V. Orlacchio, of BLANK ROME LLP, Wilmington, Delaware, *Attorneys for Defendants*.

Jessica Zeldin, of ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: James S. Notis, Jennifer Sarnelli, of GARDY & NOTIS, LLP, New York, New York; Harold B. Obstfeld, of HAROLD B. OBSTFELD, P.C., New York, New York, *Attorneys for Plaintiff*.

GLASSCOCK, Vice Chancellor

This matter involves a motion to dismiss allegations of breach of fiduciary duty by way of a corporate merger, under Court of Chancery Rule 12(b)(6). The complaint itself, if not opaque, is not entirely transparent in its allegations, as demonstrated at oral argument. There, even following full briefing centering on the complaint, the Plaintiff stockholder and Defendant fiduciaries were unable even to agree on what claims were being advanced.

In *The Lady of Shallot*,[1] Tennyson (presumably unknowingly) provides the ideal metaphor for the task of a bench judge addressing such a motion to dismiss. The eponymous Lady, of course, exists in a tower on a river island, with the charge of weaving a web representing the passing scene along the bank. She may not survey this scene directly, lest she suffer the consequences of a mysterious curse; her view is limited to the reflections in a mirror, and those reflections are themselves limited by the frame of the window out of which the Lady is, again, forbidden to look.[2]

So it is with this Motion to Dismiss. I am charged with evaluating the Plaintiff's claim. The true facts from which that claim arises are, at this stage, forbidden to me; I am limited to the facts as reflected from the point of view of the Plaintiff in his complaint. But that scenario is itself severely limited, constrained as it is to those facts the Plaintiff can muster without discovery and the development of

---

[1] *See* Lord Alfred Tennyson, *Poems* (W. D. Ticknor, 1842), *available at* https://www.poetryfoundation.org/poems/45360/the-lady-of-shalott-1842.
[2] "'I am half sick of Shadows,' said/ The Lady of Shallot." *Id.*

the record.  Only if the Motion is denied may discovery and forensics proceed to disclose, not the limited reflection, but the actual view.

In the poem, the Lady finds a particular reflection[3] so compelling that she abandons her mirror, turns to the window, and takes in the full and undistorted view (with dolorous consequence).[4]  I have carefully reviewed here the causes of action alleged in the complaint.  I am not compelled to proceed to a developed view of the facts here.  I find that, accepting the well-pled allegations as true and drawing all reasonable inferences in the Plaintiff's favor, the Complaint fails to state a claim on which relief may be granted.  I describe the facts as the limited perspective of the pleading standard allows me to perceive them, below; I then give my rationale.

## I. BACKGROUND[5]

This action arises from the sale of a small aerospace manufacturing company, Kreisler Manufacturing Corporation ("Kreisler" or the "Company"), and purported insider side-deals (the "Side Deals") in connection with the sale, along with alleged disclosure deficiencies to stockholders regarding the sales process. Before the sale, the Company was shopped to dozens of potential acquirers, several bidders emerged,

---

[3] The sight of Sir Lancelot, and/or his horse. *See id.*

[4] "Out flew the web and floated wide;/ The mirror crack'd from side to side;/ 'The curse is come upon me,' cried/ The Lady of Shallot." *Id.*

[5] The facts, except where otherwise noted, are drawn from the well-pled allegations of Plaintiff's Amended Complaint (the "Complaint" or "Compl.") and exhibits or documents incorporated by reference therein, which are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.

a fairness opinion was rendered and a special committee ultimately recommended the sale to the Board. The transaction was approved by written consent of a majority of the shares outstanding and a block of shares of just over fifty percent executed a stockholder support agreement providing for approval of the transaction (the "Merger"). There are no allegations advanced that a controlling stockholder was present. As the Merger was approved via written consent, there was no stockholder vote, and an Information Statement was provided to stockholders to inform them about the transaction and permit a determination by stockholders whether to seek appraisal.

As discussed below, a majority of the Company's board of directors ("the Board") are independent and disinterested, and the Company's charter contains an exculpation provision. In light of the foregoing and the absence of a controlling stockholder implicating the entire fairness standard of review, the Complaint must plead that a majority of the Board acted in bad faith. Two theories are pursued: first the existence and effect of the Side Deals on the merger process and price; second, alleged misstatements and omissions in the Information Statement provided to stockholders. The allegations of the Complaint are recited below, drawing all reasonable inferences in favor of the Plaintiff. Scattered within the Complaint are conclusory statements which I have attempted to exclude from the factual recitation, but to the extent such statements are included, I have endeavored to flag them.

3

*A. The Parties*

The Plaintiff, Alan Kahn, was a stockholder of the Company at all relevant times.[6] The Plaintiff held his shares in "street name," that is, he was not a record owner of Kreisler shares.[7] The Plaintiff purports to bring this direct action as a class action on behalf of all other similarly situated stockholders.[8]

Each Defendant is a director of the Company. Defendant Michael D. Stern "was a director of the Company and its Co-President, CEO, and Treasurer."[9] Defendant Edward A. Stern "was a director of the Company and its Co-President, Chief Corporate Officer, and Corporate Secretary."[10] I refer to Michael Stern and Edward Stern here as the "Stern Defendants." As the beneficiaries of the allegedly improper Side Deals, I assume for purposes of this Motion that they were "interested" in the Merger.

Defendant Joseph P. Daly was a director of the Company, and the Complaint states, in conclusory fashion, that Daly was "not considered an independent director by the board for purposes of the Merger."[11] John W. Poling and Jeffery P. Bacher

---

[6] Compl. ¶ 6.
[7] *Id.*
[8] *See id.* ¶¶ 48–54.
[9] *Id.* ¶ 7.
[10] *Id.* ¶ 8.
[11] *See id.* ¶ 9.

were both directors of the Company and there is no dispute that they were independent for purposes of the Merger.[12]

*B. The Company, the Sterns and the Transaction*

1. Kreisler Company

Kreisler is a Delaware corporation with its principal offices in New Jersey, engaged in the manufacture of components for industrial and aerospace products.[13] At the time of the Merger, Kreisler was a small, thinly-traded, public company.[14] Kreisler was not subject to "typical SEC-reporting requirements" and was instead listed on the so-called "pink sheets."[15]

The Company was co-founded in 1918 by the Stern Defendants' great-grandfather.[16] Throughout the Company's history various members of the Stern family have managed Kreisler.[17] The Stern Defendants served as "the sole executive officers of the Company" at all relevant times.[18] Following the death of Michael and Edward Stern's father, stock was transferred to Michael and Edward Stern as well as their two siblings, Jeffery R. Stern and Jody Stern.[19] These Stern family members

---

[12] *See id.* ¶¶ 10–11.
[13] *See id.* ¶¶ 1, 13.
[14] *Id.* ¶ 1.
[15] *Id.* ¶ 14.
[16] *Id.* ¶ 13.
[17] *See id.*
[18] *Id.*
[19] *See id.*

collectively owned 42.6% of the Company's shares.[20]   The Stern Defendants, Michael and Edward, each owned 12.3% whereas Jody and Jeffery each owned 9%.[21]

### 2. Alleged Stern Family In-fighting and Possible Sale of Kreisler

AB Value Partners LLC ("AB Value"), which owned through affiliates 11.6% of Kreisler, attempted a proxy contest in December of 2014.  AB Value intended to replace half of the Board with its own nominees.[22]  However, AB Value missed the advance notice deadline in Kreisler's bylaws; it unsuccessfully sought a temporary restraining order in the Court of Chancery to block the operation of the advance notice bylaw, and ultimately was unsuccessful in unseating the incumbents.[23]  The Complaint in this action alleges that Jeffery Stern supported the AB Value slate and the removal of Edward Stern and John Poling as directors of the Company.[24] Ultimately, an annual meeting was held on January 5, 2015 and the incumbent directors were reelected.[25]  The Complaint avers that, during the year of the dispute

---

[20] *Id.*

[21] *Id.*

[22] *See id.* ¶ 15. AB Value sought to remove Edward Stern and John Poling.  *Id.*  At the time of AB Value's activism in 2014, Kreisler's board only had four members: Edward Stern, John Poling, Michael Stern, and Joseph P. Daly.  *Id.*

[23] *See id.* ¶ 16; *see also AB Value Partners, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465 (Del. Ch. Dec. 16, 2014).

[24] Compl. ¶ 16.

[25] *Id.* ¶ 17.

with AB Value, the Company increased the base salary of the Stern Defendants by 57%.[26]

Despite AB Value's failure to place its slate on the Board at Kreisler, it continued to hold a large stake in the Company. The Stern Defendants, shortly after avoiding the proxy fight, began a "process of exploring a sale of the Company."[27] The Complaint alleges that given the Company's status—that it traded only on the pink sheets—exit for bulk holders of Company stock presented difficulties.[28]

The Complaint states, in conclusory fashion, that:

> [a]ny sale would have to accommodate those members of the Stern family seeking an end-stage exit while also permitting [Michael] Stern's continued equity participation and management position in the business. Potential buyers who would not accommodate those differing interests would not be considered.[29]

In this vein, the Complaint asserts that before a special committee was formed, the Stern Defendants "first hired bankers and lawyers and set the parameters for the sales process and an acceptable merger partner."[30] The Complaint points to a meeting between the Stern Defendants and SunTrust Robinson, Inc. ("Robinson Humphrey"), and the Stern Defendants' retention of Robinson Humphrey before the

---

[26] *Id.*; *see id.* at n.1. Per the numbers provided, it appears the board increased the Stern Defendants salary from $175,000 to $275,000.

[27] *Id.* ¶ 18.

[28] *See, e.g.*, *id.* ¶¶ 1, 18.

[29] *Id.* ¶ 18.

[30] *Id.* ¶ 19.

formation of a special committee (the "Special Committee").[31]   That is, the Complaint alleges that "[o]nly after [the Stern Defendants] hired and discussed the sales process with Robinson Humphrey and developed the Confidential Information Memorandum was the Special Committee formed."[32]

Following the Stern Defendants' initial interactions with Robinson Humphrey, on August 21, 2015, the Board elected an additional member, Defendant Jeffery B. Bacher, and established a Special Committee to consider strategic alternatives, consisting of Defendants Poling and Bacher.[33]   The Special Committee did not retain "any advisors independent of the Company" but used Robinson Humphrey as its financial advisor, and Blank Rome LLP, Kreisler's "main outside counsel," as the Committee's legal counsel.[34]   The Complaint avers that Bacher's election to the board was "prompted by the perceived need for another director that the Board could consider as 'independent.'"[35]   That is, the Plaintiff argues that because Daly was not appointed to the Special Committee, I must infer that he was not independent in considering the Merger.[36]   The basis of Daly's lack of independence, according to the Complaint and Plaintiff's briefing,[37] is that he

---

[31] *See id.* ¶ 19 n.2.

[32] *Id.* ¶ 20.  The Confidential Information Memorandum was a document prepared "for potential bidders." *Id.* ¶ 19.

[33] *Id.* ¶ 21.

[34] *Id.* ¶¶ 21–22.

[35] *Id.* ¶ 22.

[36] *See id.* ¶ 23.

[37] *See id.*; Pl's Answering Br. 10 n.10, 24 n.20 (citing Compl. ¶ 23).

favored a sale of the Company, aligned himself with AB Value, and was not subject to replacement via AB Value's slate.[38]

In October 2015, it appeared that AB Value might again attempt a proxy contest. On October 19, 2015, AB Value nominated two directors for election at the 2015 annual meeting, which was ultimately never held.[39] Two days after AB Value announced it would renew its efforts to partially overturn Kreisler's Board, the Stern Defendants entered into new employment agreements with the Company.[40]

### 3. The Sales Process and the Stern Defendants' Side Deals

From late October through December 2015, potential bidders conducted due diligence on Kreisler. Through the sales process, Robinson Humphrey contacted "approximately 55 parties" and entered into twenty-seven non-disclosure agreements with potential bidders.[41] The Company received seven "indications of interest."[42] Each of those seven interested parties were invited to participate in presentations by the Company's management in October through December, 2015: following the presentations four bidders withdrew, leaving three remaining.[43] Those three remaining parties submitted bids ranging from $14.23 to $18.25 per share.[44]

---

[38] *See* Compl. ¶ 23. The Complaint also notes that Daly agreed to a five-year non-compete and non-solicitation provision—the same terms to which Michael Stern agreed. *See id.*
[39] *Id.* ¶¶ 24–25.
[40] *See id.* ¶ 26.
[41] Defs' Opening Br. Ex. A (the "Information Statement") at 9.
[42] *Id.*
[43] *Id.*
[44] *Id.* at 10.

Ultimately, "the Special Committee directed Robinson Humphrey to secure best and final bids."[45] At this point, one bidder declined to increase and two revised bids were submitted.[46] Arlington Capital Partners ("Arlington") was the high bidder with a bid of $18.75 per share, as of January 6, 2016.[47] Arlington's bid, however, was conditional; "subject to adjustments."[48]

The Complaint alleges that after Arlington made the $18.75 bid, the Stern Defendants "negotiated extra benefits for themselves" and such extra benefits were not fully "explained" to stockholders in the Information Statement.[49] Specifically, the Complaint alleges that while the Company was engaged in negotiations with Arlington regarding the Merger, Michael Stern negotiated to secure employment with the post-Merger entity, and to rollover a portion of his equity in Kreisler to a new equity position in Arlington's subsidiary, United Flexible Technologies, Inc. ("United Flexible").[50] Ultimately, Michael Stern entered into a "Rollover Agreement" with United Flexible, and an "Employment Agreement" with Kreisler and Arlington at the same time the Merger Agreement was executed.[51] Pursuant to the Employment Agreement, Michael Stern would be "President and a director of

---

[45] Compl. ¶ 27.
[46] *See* Information Statement at 10.
[47] Compl. ¶ 28.
[48] *Id.*
[49] *Id.* ¶ 29.
[50] *Id.* ¶ 30.
[51] *Id.*

post-Merger Kreisler."[52]  Similarly, the Complaint alleges that Edward Stern, while Kreisler was negotiating the Merger Agreement, negotiated with the Company's Board for an amendment to his (only several month old) Employment Agreement "in order to obtain better benefits upon his desired termination from the Company when the Merger was completed."[53]  Edward Stern and Kreisler entered into an amendment to Edward's Employment Agreement on May 3, 2016.[54]

In addition, while the Company was negotiating the Merger Agreement, the Stern Defendants both negotiated for a "Sale Bonus Agreement" with Kreisler, that was ultimately entered into on April 11, 2016.[55]  Pursuant to the Sale Bonus Agreement both Stern Defendants would "receive up to a $105,000 payment (roughly a 38% bump over their annual salary), depending on the Company's cash balance as of the closing of the Merger."[56]  The Plaintiff alleges that the cash balances necessary to trigger the Sale Bonus Agreement were not adequately disclosed.[57]

The Complaint concludes that Arlington lowered its bid as a result of the Side Deals.[58]  Arlington's initial bid of $18.75, "subject to adjustments," ultimately

---

[52] *Id.*
[53] *Id.* ¶ 31.
[54] *Id.*
[55] *Id.* ¶ 32.
[56] *Id.*
[57] *Id.* ¶ 33.  I note, however, that information regarding cash balances to trigger the Sale Bonus Agreement is disclosed in the Information Statement.  *See* Information Statement at 19–20.
[58] *See* Compl. ¶ 34.

11

resulted in a Merger Agreement at $18.00 per share.[59] Although the initial bid was "subject to adjustments," the Information Statement issued to stockholders in connection to the Merger does not disclose how or why the reduction occurred.[60] The Complaint concludes that "*it appears* that the adjustment from $18.75 to $18 was made in part due to costs associated with the side deals for [the Stern Defendants] . . . ." The Plaintiff, via calculations he does not make clear, concludes that "the sale bonuses alone cost $0.11 per share."[61] That is, the Complaint requests the pleading stage inference that the Side Deals caused the reduction in merger consideration. I note the trading price for Kreisler shares the last day before the Merger announcement was $11.46 per share.[62]

The full Kreisler Board met on May 26, 2016 and was provided with drafts of both the Merger Agreement and the Information Statement.[63] The next day, the Board met again and received a fairness opinion from Robinson Humphrey before unanimously approving the Merger Agreement.[64] The Information Statement provides that the "Special Committee unanimously approved, and recommend[s] for the Board's approval, the Merger Agreement" prior to the Board approving the

---

[59] *Id.*
[60] *Id.*
[61] *Id.* (emphasis added).
[62] Information Statement at 4.
[63] Compl. ¶ 34.
[64] *Id.*

Merger.[65]  The Merger was approved by stockholders via written consent, without a stockholder vote.[66]  The Complaint asserts that the Stern Defendants, Daly, Poling, and AB Value (together holding 53.2% of Kreisler) entered into a Stockholder Support Agreement and delivered the written consent.[67]  The Complaint alleges that the Special Committee did not meet independently of the full Board on May 26 or May 27, 2016, the days "when the final agreements and presentations were being considered."[68]

### 4. Merger Terms, Disclosures and Subsequent Events

The Merger Agreement contained an "Appraisal Out" provision that relieved United Flexible from its obligation to consummate the Merger if more than ten percent of Kreisler's outstanding shares sought statutory appraisal.[69]  The Complaint alleges that "all" the Defendants were "pushing to complete the Merger" and "agreed to unusual provisions in the Merger Agreement," and concludes that the Board "knowingly failed to provide" certain disclosures in the Information Statement to stockholders to minimize appraisal activity which could thwart the Merger.[70]  Specifically, the Complaint points to a provision in the Information Statement indicating that:

---

[65] Information Statement at 4.
[66] *See* Compl. ¶ 34.
[67] *See id.*
[68] Compl. ¶ 35; *see* Information Statement at 4.
[69] Compl. ¶ 36.
[70] *See id.* ¶ 36.

13

> a copy of the Merger Agreement . . . is available for review (upon the execution of a confidentiality agreement in case of the request to review the Company Disclosure Schedule), but not duplication, solely in person, at the offices of Blank Rome LLP in Philadelphia, Pennsylvania, upon the request of *any stockholder*.[71]

The Complaint concludes that "[f]orcing stockholders to travel to Philadelphia to look at (but not copy) the Merger Agreement is evidence of Defendants' intentional efforts to create unreasonable barriers to stockholders seeking material information."[72] Beyond the physical inspection requirement, the Plaintiff points to "another unusual provision" in the Merger Agreement which limited access to view a copy of the Merger Agreement at Blank Rome's office in Philadelphia to stockholders of record.[73] The Plaintiff asserts that the representation in the Information Statement that the Merger Agreement was available for review by "any stockholder" was "false," since it was not, according to Plaintiff, explicit that "stockholder" in the Information Statement was limited to stockholders of record. He concludes, therefore, that the Defendants "knowingly misrepresented the terms of the Merger Agreement."[74] The Plaintiff, a beneficial owner,[75] learned of this stockholder of record limitation when he attempted to view the Merger Agreement.[76]

---

[71] *Id.* ¶ 37 (emphasis added).
[72] *Id.*
[73] *Id.*
[74] *See id.* ¶¶ 37, 39.
[75] *See id.* ¶ 38.
[76] *See id.* ¶ 37.

Along with the allegation of a false statement regarding access to the Merger Agreement, the Plaintiff argues that the Defendants, via inadequacies in the Information Statement, hid "material facts about the Company."[77] Specifically, the Complaint points to the following alleged omissions:

- The purported absence of a "fair summary" of the financial advisor's analysis, or current financial information for the Company since the Information Statement "only" discloses the *results* of Robinson Humphrey's Discounted Cash Flow ("DCF") analysis "in three sentences" and allegedly omits information on the "selected companies analysis" and "precedent transactions analysis" as well as information about the Company's order backlog.[78] The Complaint also alleges that the most recent quarterly financial results were withheld until the deadline to seek appraisal had passed.[79]

- The Defendants' failure to disclose in the Information Statement the "Company's five-year financial projections provided to Robinson Humphrey," only indicating that they were "favorable."[80]

---

[77] *Id.* ¶ 40.
[78] *Id.* ¶¶ 41–42.
[79] *See id.*
[80] *Id.* ¶ 43.

15

- The Defendants alleged failure to provide adequate "disclosure of the side-deals," specifically the details of the Rollover Agreement, the Sale Bonus Agreement and the New and Amended Employment Agreements.[81]

- The Defendants alleged failure to explain "how, why, or when" any adjustments were made regarding the drop in price per share from $18.75 to $18, and any relation it might have with respect to the "timing" of the "self-interested" Side Deals.[82]

The Plaintiff's theory with respect to the disclosure issues outlined above is that the Company withheld information to "intentionally prevent[] stockholders from making an informed decision with respect to their rights in connection with the Merger."[83]  The Plaintiff's theory with respect to the entire transaction, that is, both process and disclosure issues, is that the transaction was

> an underpriced Merger designed to meet the various selfish needs of different members of the Stern family.  Insiders competed for merger consideration, secured side deals for themselves, did not engage in a value maximizing process, and intentionally thwarted public stockholders from determining the higher value of the Company and learning of the Defendants' defective sales process.[84]

---

[81] *Id.* ¶ 44.
[82] *See id.* ¶ 45.
[83] *Id.* ¶ 46.
[84] *Id.* ¶ 47.

*C. Procedural History*

Certain events prior to the filing of this action are worth observing here. As noted above, the Merger was announced on May 31, 2016, the Information Statement was mailed the same day, and the deadline to seek appraisal was June 20, 2016.[85] The Plaintiff requested a copy of the Merger Agreement on June 15, 2016.[86] That same day it was explained to the Plaintiff that only stockholders of record could review the Merger Agreement.[87] The Plaintiff did not exercise statutory appraisal rights by the June 20, 2016 deadline.

Instead, the Plaintiff initiated this action via his Verified Class Action Complaint on June 23, 2016. The Plaintiff did not seek to block the Merger or request any other emergency or expedited relief. The Defendants moved to dismiss the initial complaint on August 29, 2016. The Plaintiff then filed a Verified Amended Class Action Complaint (the "Complaint") on October 27, 2016. The Defendants again moved to dismiss, and the parties fully briefed the Defendants' Motion.

The Complaint pleads one count against all the Defendants for breach of fiduciary duty. The Complaint states three grounds for its sole count. First, the Complaint alleges that the "Defendants breached their fiduciary duties by knowingly

---

[85] *See id.* ¶ 3.
[86] *See id.*; Defs' Opening Br. Ex. B.
[87] *See* Compl. ¶ 37; Defs' Opening Br. Ex. C.

engineering and/or approving a sales process designed to benefit the particular selfish interests of Company insiders rather than engage in an open process reasonably designed to maximize stockholder value."[88] Next, the Complaint alleges that the "Defendants breached their fiduciary duties by knowingly competing for merger consideration or permitting other insiders to compete for merger consideration by securing or approving lucrative deals for M[icheal] Stern and E[dward] Stern, all of which resulted in [a] lower Merger price."[89] Finally, the Complaint alleges that the "Defendants breached their fiduciary duties by knowingly withholding and/or [misrepresenting] material information from stockholders. Defendants were presented with the Information Statement, knew that the Information Statement omitted material information and made material misstatements, and yet approved its dissemination to Kreisler's public stockholders."[90] The Complaint concludes that these actions "unfairly deprived Plaintiff and other members of the Class of the true value of their investment in Kreisler, as well as their ability to make a fully informed decision as to whether to pursue an appraisal, making quasi-appraisal damages an available remedy for the Class."[91] The Plaintiff's theory of breach of duty attacks the process and price of

---

[88] Compl. ¶ 57.
[89] *Id.* ¶ 58.
[90] *Id.* ¶ 59.
[91] *Id.* ¶ 60.

18

the transaction as well as the disclosures made in connection with the Merger.[92] Among other remedies, the Plaintiff seeks quasi-appraisal for the deprivation of the information needed to determine whether to bring an appraisal action, as well as rescissory damages, disgorgement and an accounting.[93]

Oral argument was held on the Defendants' Motion on May 4, 2017. Shortly thereafter, on May 11, 2017 the Defendants submitted a letter requesting the Court to review supplemental authority in support of their arguments. What follows is my decision on the Defendants' Motion.

## II. ANALYSIS

The Defendants have moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). When reviewing a motion to dismiss pursuant to Rule 12(b)(6)

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[94]

However, I need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[95]

---

[92] *See, e.g., id.* ¶¶ 1–5, 57–59.
[93] *Id.* at Prayer For Relief.
[94] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).
[95] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011).

19

Rendering a decision on the pending Motion is problematic, as the parties failed to coincide in briefing about what this Complaint actually pleads.[96] At oral argument, there was a fundamental disagreement between the parties as to whether this action is simply a quasi-appraisal suit for false or omitted disclosures, or rather a standalone breach of fiduciary duty action directed at the Side Deals. Each side accuses the other of mischaracterization of the Complaint.[97] The Defendants framed this action as purely about appraisal rights and whether, in bad faith, the Defendants failed to make sufficient disclosures in the Information Statement to inform pursuit of such rights. The Plaintiff characterized the action at oral argument as primarily pleading a substantive process claim whereby certain insiders were competing for consideration with stockholders, and that the Director Defendants permitted the Side Deals in breach of the duty of loyalty.[98]

I find, on review of the Complaint, that the Plaintiff has attempted to plead both process and disclosure claims. Specifically, paragraphs fifty-seven and fifty-eight of the Complaint, which are both nested within the sole Count alleged for breach of fiduciary duty, assert that the Board knowingly engineered and approved a sales process to benefit particular insiders, and knowingly competed for merger

---

[96] See, e.g., Draft Oral Argument Tr. (May 4, 2017) at 23–29 (discussing, on behalf of the Plaintiff, the failure to join issue on the process claim); see also id. at 44 (arguing on behalf of the Defendants, that the Complaint "essentially, after you get past the background, starts on paragraph 36 to 47. So it's a ten-paragraph complaint. It's skeletal of a complaint . . . .").

[97] See, e.g., id. at 25.

[98] See id. at 21–22.

20

consideration or permitted insiders to compete for merger consideration in violation of their fiduciary duties.[99]  Accordingly, I review both process- and disclosure-related claims under the motion-to-dismiss standard.  I turn to that analysis now.

Where, as here, a plaintiff seeks damages from directors for breach of fiduciary duty by way of a merger, and the directors (as here) are protected by an exculpatory charter provision,[100] any claims against them must be dismissed unless those claims sufficiently allege a breach of the duty of loyalty.  That is, the Company's decision to employ an exculpation provision under 8 *Del. C.* § 102(b)(7) shields the directors from duty-of-care claims; therefore, to survive this Motion, the Plaintiff must point to facts alleged in the Complaint implicating a breach of the duty of loyalty.[101]  To state a claim for a breach of the duty of loyalty in this action, the Complaint must contain "sufficient facts to show that a *majority of the Board of directors* breached the fiduciary duty of loyalty . . . ."[102]  That is, in the absence of a controller, the fact that claims might otherwise be stated against a minority of members of the board of directors "would not be controlling."[103]

---

[99] *See* Compl. ¶¶ 57–58.  I note factual allegations about the particular agreements executed are contained in various other paragraphs of the Complaint.  *See e.g.*, *id*. ¶¶ 2, 29–35.

[100] *See* Defs' Opening Br. Ex. D.

[101] *See Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016).

[102] *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) (emphasis in original).

[103] *See id.*

Here, the burden on the Plaintiff is to plead facts from which the Court can reasonably infer that a majority of the Director Defendants were interested in the transaction, or dominated or controlled by an interested party, or that the majority of the Board failed to act in good faith.[104] At this post-closing damages stage of proceedings, the Plaintiff must clear this pleading hurdle,[105] with respect to both his process and disclosure claims.[106] The Plaintiff has advanced in briefing two theories that a breach of the duty of loyalty is sufficiently pled: first, that a majority of the Board was "interested in the transaction;"[107] and second that the majority of the Board acted in bad faith with respect to the mal-disclosures and omissions, and in approving the Merger with the Side Deals. I address each in turn, below.

*A. The Complaint Fails to Allege a Majority of the Board is Interested*

It is undisputed that two of the five directors, the Stern Defendants, were interested in the Merger. It is also undisputed that two of the five directors, Poling and Bacher, were not interested. Thus, whether the majority of the Board was

---

[104] *See id.*; *see also Orman v. Cullman*, 794 A.2d 5, 24–25 (Del. Ch. 2002) ("In order to rebut the presumptions of the business judgment rule, [a plaintiff] must allege facts that would support a finding of interest or lack of independence for a majority . . . of the Board members.").

[105] I conclude that, at this stage, enhanced scrutiny is inapplicable. At oral argument the Plaintiff clarified that he is not seeking such a standard of review under *Revlon*. Draft Oral Argument Tr. (May 4, 2017) at 39–40.

[106] *See, e.g.*, *Nguyen*, 2016 WL 5404095, at *3 (explaining that "when asserting a disclosure claim for damages against directors post-close, a plaintiff must allege facts making it reasonably conceivable that there has been a non-exculpated breach of fiduciary duty by the board in failing to make a material disclosure," that is, "the plaintiff must demonstrate that a majority of the board was not disinterested or independent, or that the board was otherwise disloyal because it failed to act in good faith, in failing to make the material disclosure") (citations omitted).

[107] *See* Pl's Answering Br. 24 n.20.

22

interested turns solely on whether the Plaintiff has sufficiently alleged that Director Daly was interested.[108]  Generally, a director is considered interested when she "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[109]

Resolution of this issue,[110] to my mind, is clear: The Plaintiff has failed to adequately allege that Daly was interested.  The sole allegations pled and "advanced" in briefing (albeit only in footnotes) regarding Daly's alleged interest are that he "had a large, illiquid block of shares, favored a sale of the Company, had aligned himself with AB Value who was agitating for a sale, and was excluded from the Special Committee." I turn to whether the actual facts pled demonstrate that Daly suffered from a disabling interest in the transaction.

The Plaintiff points to Daly's alleged "illiquid block" as a basis for his interest, along with his purported prior alignment with AB Value.  The record reflects that Daly owned approximately 19.1% of the Company's outstanding shares, making him, apparently, the largest single stockholder.[111]  Notably absent from the

---

[108] I note while there are cursory allegations that the Sterns were controlling stockholders of the Company in the Complaint, the Plaintiff has not pursued this matter as an entire fairness action triggered by the existence of a controller.  To the extent this allegation was well-pled in the Complaint, I consider it waived as it was not advanced in briefing.

[109] *In re Alloy, Inc.*, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011) (quoting *Rales v. Blasband,* 634 A.2d 927, 936 (Del. 1993)).

[110] To the extent it was not waived.  *See, e.g., Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) (stating "[i]t is settled Delaware law that a party waives an argument by not including it in its brief") (citations omitted).

[111] Information Statement at 49.

Complaint is any allegation that Daly received different or unique consideration. Nor does the Complaint allege that he faced a liquidity crisis or a particular exigent need that would necessitate a fire sale of his interest.[112] Absent such a circumstance, it is apparent that his incentives were the same as that of common holders: to maximize the value of his investment. The Complaint fails to plead a disabling interest.

To the extent that the Plaintiff argues that Daly is not independent with regard to the Merger, such that he was unable to bring his business judgment to bear on behalf of the Company, that argument is unavailing as well. In order to successfully plead a lack of independence, a Plaintiff must plead facts that, if true, overcome the presumption of a director's faithfulness to her fiduciary duties. This Complaint is lacking in that regard, and fails to raise a reasonable doubt that Daly was unable to "objectively make a business decision" concerning the Merger.[113] While the Complaint states that "Daly was not considered independent [presumably by his fellow directors] for purposes of the Merger,"[114] that is simply a conclusion asserted in the Complaint devoid of any factual support.[115] It appears to me that the Plaintiff wishes that I infer Daly was, in fact, not independent because he was considered not

---

[112] *See In re Cyan, Inc. Stockholders Litig.*, 2017 WL 1956955, at *10; *see also* Draft Oral Argument Tr. (May 4, 2017) at 50 (conceding on behalf of the plaintiff that a fire-sale or liquidity crisis is not pled).
[113] *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).
[114] *See* Pl's Answering Br. 10 n.10, 24 n.20 (citing Compl. ¶ 23).
[115] *See* Compl. ¶ 9.

24

independent by the Company or Board itself; that inference, in turn, is (theoretically) implied by the fact that he was not appointed to the Special Committee.[116] The Plaintiff points to no facts in support of the conclusion that Daly lacked independence, and I do not consider this bare allegation well-pled in light of the Plaintiff's failure to point to any specific facts supporting it.[117]

*B. The Complaint Fails to Allege Bad Faith by a Majority of the Board*

In the face of a majority disinterested and independent board, and an exculpatory charter provision, to survive this Motion and pursue a post-closing damages claim for breach of fiduciary duty, the Plaintiff must plead facts making it reasonably conceivable that the majority of the Board acted in bad faith.[118]

"[B]ad faith will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'"[119] Similarly, bad faith will be found when "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[120] As this Court recently noted, "[t]his is a difficult standard to meet."[121] The Plaintiff points to two sets of allegations, that in his view,

---

[116] *See* Pl's Answering Br. 10 n.10, 24 n.20 (citing Compl. ¶ 23).
[117] *See* Pl's Answering Br. 24 n.20.
[118] *See In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6.
[119] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (quoting *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del. 2006)).
[120] *In re Cyan, Inc. S'holders Litig.*, 2017 WL 1956955, at *8 (quoting *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000)).
[121] *See In re MeadWestvaco S'holders Litig.*, 2017 WL 3526326, at *6 (Del. Ch. Aug. 17, 2017).

25

rise to the level of bad faith: the Defendants' approval of the Merger with knowledge of the Side Deals, and the alleged omissions and misstatements in the Information Statement. Each set of allegations is addressed in turn below.

a. Approval of the Merger

The Plaintiff asserts in briefing that in approving the Merger the Board took action that "lacked rational corporate purpose and should be deemed to be the product of bad faith."[122] Plaintiff's theory appears to be that the *purported decision* of the Defendants to "favor the side agreements over the payment of additional consideration to stockholders is bad faith."[123] Specifically, the Plaintiff points to the Stern Defendants' receipt of the Sale Bonus Agreement, Edward Stern's amended Employment Agreement providing "benefits" upon completion of the Merger, and Michaels Stern's new Employment Agreement for continued tenure and the Rollover Agreement.[124] The Plaintiff concludes that the Stern Defendants provided no "consideration" for these benefits, and that these side agreements deprived stockholders of value.[125] The Plaintiff requests the pleading stage inference that the bid of "$18.75, subject to adjustments," was adjusted downward by some amount to

---

[122] *See* Pl's Answering Br. 22–23.
[123] *Id.* at 25.
[124] *Id.* at 24.
[125] *Id.*

reflect the cost of the Side Deals.[126] The Plaintiff calculates that the "sale bonuses alone cost $0.11 per share."[127]

The Defendants observe that the Complaint and briefing are devoid of any allegations supporting a reasonable inference that directors Daly, Poling, or Bacher were involved in the Side Deals or engaged in bad faith conduct themselves.[128] The Defendants contend, correctly, that to withstand their Motion the Complaint must allege that the Board's approval of the Merger, in the face of the Side Deals, was so far beyond the bounds of reasonable business judgment that it is inexplicable on the grounds other than bad faith: otherwise, the process allegations must be dismissed. This is a high standard indeed. At the pleading stage, I must determine whether the Complaint contains sufficient allegations that could reasonably lead to an inference that the decision of the Board is inexplicable absent bad faith.[129]

The Plaintiff points to the initial offer of "$18.75, subject to adjustments," the final sales price of $18.00, and relies on an inference that some of this reduction resulted from the Side Deals. Such an inference alone is unavailing, it must be reasonably conceivable that such portion of reduction allocable to the Side Deals, if

---

[126] *See id.* at 24–25. I note the sole allegation of the Complaint cited in Plaintiff's briefing in opposition to the Motion to Dismiss involves only the Stern Defendants' actions in negotiating the Side Deals with the acquirer. *See id.* at 22–25 (citing only Compl. ¶ 31).

[127] *See* Compl. ¶ 34.

[128] The briefing is rather sterile regarding the process allegations, presumably because the Defendants read the Complaint as stating principally, or only, disclosure claims, and the Plaintiff's Answering Brief was largely responsive to the Defendants' arguments regarding disclosure.

[129] *See Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *4–5 (Del. Ch. Nov. 6, 2002).

any, makes Board approval inexplicable absent bad faith. Here, the Complaint falls short.

The Complaint contains a single relevant section, titled "*Arlington Lowers its Bid as a Result of the Side Deals*."[130] That portion of the Complaint provides in pertinent part, however, simply that:

> [t]he Information Statement does not disclose how Arlington's bid of '$18.75 per share, subject to adjustments' was changed into a Merger Agreement at $18 per share, *though it appears* that the adjustment from $18.75 to $18 was *made in part due* to costs associated with the side deals for [the Stern Defendants] (the sale bonuses alone cost $0.11 per share).[131]

To the extent I can consider the merger-reduction facts laid out above as non-conclusory allegations, the Plaintiff's Complaint still does not plead facts creating a reasonable inference of bad faith, because the amount of the reduction actually arising from the Side Deals, and hence its materiality, is never pled; more importantly, pleadings to negate the good faith of the independent directors approving the Merger in light of the Side Deals are absent.

The Plaintiff points to several cases as supportive of his argument[132] that this majority independent Board must have acted in bad faith here, relying primarily on

---

[130] Compl. ¶ 34 (emphasis in original).
[131] *Id.* (emphasis added); *see also id.* ¶ 3 (concluding "these side deals prompted the lower bid accepted by Defendants").
[132] *See* Draft Oral Argument Tr. (May 4, 2017) at 27–32; *see also* Pl's Answering Br. 23.

*Alidina v. Internet.com Corporation.*[133]  The Plaintiff asserts[134] that the cases he cites

"build on the Supreme Court decision in *Parnes* [*v. Bally Entertainment*

*Corporation*]"[135] which stands for the proposition that, in certain circumstances,

even in the absence of a controller, a majority disinterested Board can breach the

duty of loyalty when it approves an unfairly negotiated transaction that benefits an

insider at the expense of other stockholders, and that is inexplicable in reference to

business judgment.[136]  This proposition is true enough; it is the well-pled facts

supporting such a conclusion that are absent here.  The standard for overcoming the

presumption of loyalty, supporting an inference of bad faith, is necessarily high.  The

cases the Plaintiff relies on make this clear.  For example, *Alidina* explains that the

bad faith theory the Plaintiff seeks to invoke here is really a "narrow escape hatch"

to be employed "in those *rare* cases where the decision under attack is so far beyond

the bounds of reasonable judgment that it seems essentially inexplicable on any

ground other than bad faith."[137]  The *Alidina* Court then highlights that to meet this

standard, "[t]he decision must be egregious, lack any rational business purpose,

---

[133] 2002 WL 31584292.
[134] *See* Draft Oral Argument Tr. (May 4, 2017) at 27.
[135] 722 A.2d 1243 (Del. 1999).
[136] *See Alidina*, 2002 WL 31584292, at *4–5 (citing *Parnes,* 722 A.2d 1243; *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963 (Del. Ch. 2000)).
[137] *Id.* at *4 (emphasis in original) (internal quotation marks and citations omitted).

constitute a gross abuse of discretion, or be so thoroughly defective that it carries a badge of fraud."[138]

*Alidina* involved alleged actions by the interested party that constituted conduct "so egregious" that the independent Board "likely could not have approved the Transactions in good faith."[139]  Specifically, the complaint in *Alidina* alleged that the Board "knew" that the interested party sought out the merger partner, "dictated the terms of the Transaction, secured a valuable asset of the company at a grossly unfair price, and diverted funds away from the company to himself."[140]  The valuable asset secured by the insider, and acquiesced to by the Board, was the sale of a subsidiary of the target to the CEO of the target who was also a member of the target's Board and a 26% stockholder.[141]  This side-deal to the insider was "demanded" in exchange for his approval of the overarching merger and it was alleged with particularity that the side-deal diverted substantial funds away from the company to the insider.[142]  Importantly, there were favorable changes in the valuation of the subsidiary to the insider's benefit—he was able to receive 80.1% of the subsidiary for $18 million where the initial letter of intent indicated the sale

---

[138] *Id.* (internal quotation marks and citations omitted).  I note the *Alidina* decision predates this Court's and the Supreme Court's decisions in the *Disney* line of cases which speak to the bad faith standard under Delaware law.
[139] *Id.* at *6.
[140] *Id.*
[141] *See id.* at *1, 6.
[142] *See id.* at *1.

would be 50% for $15 million.[143]   The transaction was approved *sans* a special committee, and five months after the transaction the subsidiary completed an initial public offering selling 3.4 million shares at $14 a share (implying a valuation of at least $47.6 million).[144]   On these facts the *Alidina* Court found it reasonably conceivable that bad faith was implicated by the side-deal where it was alleged a "*grossly inadequate*" purchase price was paid by a fiduciary "demanding" he be sold a valuable asset "on the cheap" and thereby caused a diversion of "significant funds from the Company to [the insider] . . . ."[145]   In light of the sufficient allegations that the self-dealing CEO "tainted the entire process," and the directors' acquiescence to the process, the *Alidina* Court found that the complaint pled facts indicating that the insider CEO's "conduct would have been so egregious that the [target's] board likely could not have approved the Transactions in good faith."[146]

Thus *Alidina*, as with the cases that it follows,[147] involves extreme sets of facts making it reasonably conceivable that an independent board intentionally disregarded its fiduciary duties, or took an action inexplicable on any grounds other than bad faith in approving a merger in the face of side-deals.[148]   *Parnes*, for

---

[143] *See id.* at *2.
[144] *Id.* at *3.
[145] *Id.* at *5–6 (emphasis in original).
[146] *Id.* at *6.
[147] *See id.* at *5–6 (discussing *Parnes*, 722 A.2d 1243 (Del. 1999) and *Crescent/Mach I Partners*, *L.P.* 846 A.2d 963).
[148] *See Parnes*, 722 A.2d at 1245–47 (finding the numerous side-deals pled evinced sufficiently egregious conduct to imply bad faith by the board).

31

example, included a pleading that the CEO, the interested beneficiary of the side-deals in that case, "tainted the entire process of finding an interested merger partner and negotiating the transaction by demanding a bribe" such that it was "inexplicable that independent directors, acting in good faith, could approve the deal."[149]  The CEO "informed all potential acquirers that his consent would be required" and to obtain his consent that they would have to pay him "substantial sums of money and transfer to him valuable . . . assets," all while the CEO had no authority to demand such payments and asset transfers.[150]  The complaint in *Parnes* set out, with specificity, several inappropriately extracted side-deals that garnered the insider tens of millions of dollars that otherwise would have flowed to the stockholders.

Similarly, In *Crescent/Mach I Partners, L.P. v. Turner*,[151] the merger process was so tainted that the Court found the remaining disinterested directors essentially "aided and abetted" the conflicted party's breach of his duty of loyalty.[152]  The circumstances in *Crescent* were that a CEO and Chairman of the board secured upwards of five separate, and favorable, side-deals for himself that provided him "substantial benefits" not available to minority stockholders.[153]  The *Crescent* Court found the circumstances such that the self-interested side-deals, as alleged in the

---

[149] *Id.* at 1246–47.
[150] *Id.* at 1245–46.
[151] 846 A.2d 963 (Del. Ch. 2000).
[152] *Id.* at 981–83.
[153] *See id.* at 982–83.

complaint, rose to the level of tainting the entire merger process such that it was reasonably conceivable the independent directors acted in bad faith to enable the majority stockholder to wrongfully benefit at the expense of the corporation.[154]

In contrast, in *In re Alloy*,[155] the Court found certain side-deals alleged were reasonable conditions to the merger that failed to rise to the level of tainting the entire process. The side-deals in *Alloy* included the following for two insiders: "(1) continued employment as CEO and COO, respectively, (2) an exchange of their existing Alloy shares for shares in Alloy's new parent company, and (3) an initial profits interest grant in that parent."[156] The *Alloy* Court observed that the "terms can be explained on grounds other than bad faith" finding that

> "[o]ne plausible, and legitimate, explanation is that [the acquirer] wanted to ensure that those members of Alloy's management with the best knowledge and expertise regarding the Company continued to manage its affairs after the Merger and that they were properly incentivized to do so. Given this plausible and legitimate explanation for the board's decision to approve the benefits to [two insiders], I cannot reasonably infer that doing so was so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[157]

In so holding, the *Alloy* Court distinguished *Parnes* and *Crescent,* finding that the circumstances in *Alloy* did not support a reasonable inference that approval of the

---

[154] *See id.*
[155] *See In re Alloy, Inc.*, 2011 WL 4863716 (Del. Ch. Oct. 13, 2011).
[156] *Id.*
[157] *Id.* (internal quotations and citations omitted).

side-deals rose to the level of being "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[158]

Here, the question is whether facts pled imply that the Side Deals were not reasonable conditions of the Merger, but instead are inexplicable in the interest of the Company and its stockholders so that I must infer bad faith. The context here is a sales process involving a lengthy and wide-ranging attempt to generate best price. I find that in light of the scant facts pled and argued here that there is an absence of circumstances redolent of actions without the corporate interest, such that it is reasonably conceivable that the Board took action inexplicable on grounds other than bad faith. With respect to the Sales Bonus Agreement (conditioned on performance), and the benefits (including the roll-over of stock and continuing employment) flowing to Michael Stern, a potential rational business purpose exists: to incentivize proper management of the Company through and after the Merger, as in *Alloy*. If I find a sufficient pleading of bad faith, then, it must be regarding the amendments to the Employment Agreement with respect to Edward Stern. Because Edward did not contemplate continuing employment, this benefit is problematic.

The Complaint falls short of pleading facts with respect to Edward's benefits, however. Necessary details to reach the Plaintiff's desired inference, that no good-

---

[158] *See id.* at *11–12 (citation omitted).

faith ground existed to approve the Merger with these benefits included, are wholly lacking. Such a pleading would include, for example, details about the nature and materiality of the benefits provided to Edward Stern in his amended Employment Agreement. The Complaint simply states he obtained "better benefits" upon his desired termination.[159] Without more, I cannot infer that the benefits were unearned, material in light of the merger consideration, or otherwise were "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[160]

In sum, I find that the facts pled in regard to the Side Deals fail to rise to such a level that I may reasonably infer bad faith on the part of the majority of the Director Defendants in approving the Merger.

I now turn to the disclosure claims, and Plaintiff's request for quasi-appraisal damages.

### b. Disclosure Omissions and Misstatements

If this were a request for injunctive relief, pre-close, my analysis of the disclosure allegations would be quite different. In that situation, I would employ enhanced scrutiny in review of the disclosure allegations, not to determine damages owed any plaintiff, but to afford equitable relief in aid of the stockholders pursuing

---

[159] Compl. ¶ 31.
[160] *See In re Alloy, Inc.*, 2011 WL 4863716, at *11–12 (citations omitted).

statutory voting or appraisal rights. Equity would be employed to remedy any material insufficiency in the disclosures.

Post-close, the focus is not simply on whether material deficiencies exist with the disclosures; rather, my analysis must turn on whether the Defendants, here the directors of the acquired entity, are conceivably liable to the stockholder Plaintiff for *damages*. "[W]hen asserting a disclosure claim for damages against directors *post-close*, a plaintiff must allege facts making it reasonably conceivable that there has been *a non-exculpated breach* of fiduciary duty by the board in failing to make a material disclosure."[161] Here, to state a non-exculpated claim the Plaintiff cannot simply point to erroneous judgment in the failure to make a disclosure, implicating the duty of care, but rather must point to facts in the Complaint supporting an inference that the Board acted in bad faith in issuing the disclosure, implicating the duty of loyalty.

As discussed, a showing of bad faith requires an "extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or that the decision . . . [was] so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[162] In briefing, the Plaintiff has pointed to the following as indicia of bad faith: (1) that the

---

[161] *Nguyen*, 2016 WL 5404095, at *3 (emphasis in original).
[162] *Id.* (quoting *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016)) (alteration supplied by the Court in *Nguyen*).

36

Information Statement contained an affirmative misrepresentation about access to the Merger Agreement, (2) the Information Statement's purported failure to include a "fair summary" of the financial advisor's valuations, as well as to provide financial projections that management provided to the financial advisor, and (3) the purported failure of the Information Statement to provide details of the negotiations with the Stern Defendants regarding the Side Deals.[163]

It is, I believe, worth stating with specificity what I have limned above. If the Plaintiff or another stockholder had sought injunctive relief prior to closing, the issue before me would be whether the Information Statement withheld or misstated information material to the decision of the stockholders to approve the Merger, or to seek appraisal. The pleading standard would be enhanced scrutiny. In such a context, failure to inform stockholders that only stockholders of record could view the Merger Agreement (or the decision, itself, to so limit access) might well be inimical, in a material way, to stockholders considering whether to accept the merger consideration. Similarly, the decision to withhold management projections and other elements leading to the fairness opinion has been held, in appropriate circumstances, to merit injunctive relief. Those circumstances, as well as the alleged deficiencies in the explanation of the Side Deals, were all known to stockholders here pre-close. Injunctive relief could have been, but was not, pursued.

---

[163] *See* Pl's Answering Br. 29–41.

37

The situation before me is very different. I have found the majority of the Board to have been disinterested and independent in recommending the Merger. The directors are protected by an exculpation clause. Nonetheless, the Plaintiff seeks the opportunity to receive damages from the directors. To do so, it is insufficient to plead material defects in the Information Statement; he must plead facts that, if true, make it reasonably conceivable that the deficiencies in the Information Statement resulted from the directors' bad faith.[164] Independent and disinterested directors are presumed to have acted in good faith; to meet his pleading burden, the Plaintiff must demonstrate knowing disregard of a duty, or point to disclosure deficiencies permitted by the directors, where that permission is inexplicable otherwise than as promoting an interest inimical to the Company.

A director's decision to limit access to the merger agreement and valuation metrics could have a valid business purpose. An omission of material disclosures could be the result of director negligence, or even gross negligence. Such mis-disclosures are not actionable here. The Plaintiff alleges only that material deficiencies exist, and points to nothing that would explain the deficiencies in a way that implicates bad faith. He points to nothing in the disclosures withheld that would have been adverse to the deal. Pleading material disclosure deficiencies, without

---

[164] *See Nguyen*, 2016 WL 5404095, at *3.

38

more, is not sufficient for a pleading that independent, disinterested directors breached a duty of loyalty.

The most problematic of the disclosure allegations involves the Side Deals. I have already found that the Plaintiff has failed to state a claim against the directors for approving the Merger in light of the Side Deals. The Plaintiff urges me to consider both that process claim *and* what he characterizes as the improper disclosure with respect to the Side Deals as, cumulatively, raising a reasonable doubt that the Defendants acted in good faith. He points out that the disclosures omit the relationship, if any, between the Side Deals and the ultimate consideration paid to stockholders. The Plaintiff argues in briefing that the Defendants acted in bad faith by failing to "provide any detail surrounding the negotiation" of the Stern Defendants' Side Deals.[165] He points to the fact that the Merger Agreement contained an "out" for the buyer if appraisal demand reached ten percent of shares outstanding, and argues that in light of that fact, less than full disclosure of the Side Deals implicates bad faith.

The Information Statement provides a detailed recitation of the Merger negotiations, which spanned several months, and includes the range of initial offers, and the process followed in securing the best and final bids.[166] Further, the

---

[165] *Id*. at 38–41.
[166] *See* Information Statement at 9–11.

Information Statement highlights in the summary section that certain insiders have interests in the Merger—the Side Deals—that may be different from that of stockholders.[167] The Information Statement dedicates approximately four single-spaced pages[168] to delineating the "interests of [the] executive officers and directors in the merger," including that the "Company's executive officers and directors have interests that are different from, or in addition to, the interests of the stockholders of the Company generally" and that "[t]he Board was aware of these interests and considered them, among other matters, in approving the Merger Agreement."[169] The "Executive Employment Agreements" subsection describes in detail the termination provisions and any severance payments triggered thereby.[170] A separate subsection details the "Sale Bonus Agreements" to each of the Stern Defendants, including that "sale bonuses will be paid if the Closing Cash is in excess of $6,100,000" minus certain other defined types of cash.[171] Options given to the Stern Defendants and others are explained by number and exercise price.[172] The "Indemnification and Exculpation of Directors and Executive Officers" is given its own section.[173] Lastly,

---

[167] *Id.* at 3.
[168] *See* Information Statement at 18–22.
[169] *Id.* at 18.
[170] *Id.* at 18–19.
[171] *Id.* at 19–20.
[172] *Id.* at 20–21.
[173] *Id.* at 35.

40

the "New Arrangements with Parent" and the Stern Defendants are explained, including extensive details about the new Employment and Rollover Agreements.[174]

The Plaintiff argues that, despite the elaborate explanation of the Side Deals described above, the Information Statement omits the "why," that is, the business purpose for the Side Deals, and omits the play-by-play of the negotiation of the Side Deals. Such information, no doubt, would be of interest[175] to stockholders. Even assuming its materiality, however, to my mind the disclosures, made or omitted, fall short of implying bad faith. The directors recommended a merger that included bonuses to executives and an employment agreement, post-close, for one of them. Both the existence and the operation of these Side Deals were disclosed in detail. To the extent the Plaintiff's theory is that the Board was trying to cover up the Side Deals to discourage appraisal demands, in light of the ten percent appraisal "out," the detailed disclosures belie that intent. There is simply nothing, in light of the

---

[174] *Id.* at 21–22. For example, the Employment Agreement subsection includes information on smaller matters such as "an all-inclusive automobile allowance of $600 per month."

[175] This Court has repeatedly noted that lack of information as to why actions were taken, the blow-by-blow descriptions of transactions, and other information of potential interest to stockholders regarding a merger, do not in themselves establish material disclosure deficiencies. *See In re Saba Software, Inc. Stockholder Litig.*, 2017 WL 1201108, at *12 (Del. Ch. Mar. 31, 2017), *as revised* (Apr. 11, 2017); *Globis Partners, L.P. v. Plumtree Software*, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007) (finding that full and fair disclosures do not require a "play-by-play description of merger negotiations") (citation omitted). I note that, here, the disclosures made were not in aid of a vote, as the Merger was to be approved via written consent: they were made to inform stockholders to permit an informed choice whether to seek appraisal. *See* Information Statement at Cover Letter.

description of the Side Deals in the Information Statement, that suggests a cover-up or is otherwise redolent of bad faith on the part of the directors.

In a pre-close action, it is possible, even likely, that some disclosure deficiencies alleged—failure to disclose management projections relied on in the fairness opinion, for instance—would be found material and support injunctive relief. In this damages action, the same disclosure deficiencies are insufficient to state a claim; "[n]othing in the record creates an inference that the Defendants *deliberately* withheld the information or disregarded a manifest duty."[176]

### III. CONCLUSION

The Defendants' Motion is GRANTED, for the reasons outlined above in this Memorandum Opinion. An Order is attached.

---

[176] *Nguyen*, 2016 WL 5404095, at *6 (emphasis in original).

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ALAN KAHN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 12498-VCG |
| | ) |
| MICHAEL D. STERN, EDWARD A. | ) |
| STERN, JOSEPH P. DALY, JOHN W. | ) |
| POLING and JEFFREY P. BACHER, | ) |
| | ) |
| Defendants. | ) |

## ORDER

AND NOW, this 28th day of August, 2017,

The Court having considered the Defendants' Motion to Dismiss, and for the reasons set forth in the Memorandum Opinion dated August 28, 2017, IT IS HEREBY ORDERED that the Motion is GRANTED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor

43